UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA : | |
| : | |
| v. : | CASE NO. 21-CR-689 (ABJ) |
| : | |
| THOMAS PATRICK HAMNER, : | |
| : | |
| Defendant. : | |

### GOVERNMEN'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO REVOKE OR AMEND DETENTION ORDER

The United States of America, by and through its Attorney, the United States Attorney for the District of Columbia, respectfully opposes defendant Thomas Patrick Hamner's motion for release pending trial under 18 U.S.C. §§ 3145(b) and 3142(i).[1] In his motion, Hamner asserts the ability to offer collateral for his release and claims that (1) there is no attorney-client phone line at the jail, (2) he's been threatened by gang members, and (3) his father's health is failing.

The defendant was obstructive and assaultive in his actions at the U.S. Capitol on January 6, 2021, repeatedly pulling down barriers and helping use a large sign as a battering ram against a defensive line of police officers. Hamner's violent criminal history, his criminal activity while under supervision, his history of failing to appear, his substance abuse history, and the nature of the instant offense all evince there is no combination of conditions that could reasonably assure the defendant's appearance as required or the safety of the community and his motion should be denied.

---

[1] Although the defendant has been found guilty of an offense, he does not separately seek release under 18 U.S.C. § 3143.

1

I. **BACKGROUND**

    A. **Procedural Posture**

On November 9, 2021, the defendant, Thomas Patrick Hamner, was arrested in the District of Colorado on an arrest warrant issued from the United States District Court for the District of Columbia by Magistrate Judge Zia M. Faruqi in connection with a Criminal Complaint charging the defendant with Assaulting, Resisting, or Impeding Certain Officers as a Felony, in violation of 18 U.S.C. § 111(a) and (b), Obstruction of Law Enforcement During Civil Disorder, in violation of 18 U.S.C. § 231(a)(3), Knowingly Entering or Remaining in any Restricted Building or Grounds Without Lawful Authority, in violation of 18 U.S.C. § 1752(a)(1), and Engaging in Acts of Physical Violence in any Restricted Buildings or Grounds, in violation of 18 U.S.C. § 1752(a)(4).

Following a contested detention hearing in the District of Colorado on November 15, 2021, a magistrate judge ordered the defendant detained pending trial, citing both the defendant's risk of flight and the danger he poses to the community.

On November 19, 2021, a grand jury sitting in the District of Columbia returned a six count indictment against the defendant, charging him with Assaulting, Resisting, or Impeding Certain Officers as a Felony and Aiding and Abetting, in violation of 18 U.S.C. §§ 111(a) and (b) and 2, two counts of Civil Disorder and Aiding and Abetting, in violation of 18 U.S.C. §§ 231(a)(3) and 2, Entering or Remaining in any Restricted Building or Grounds With a Deadly or Dangerous Weapon, in violation of 18 U.S.C. § 1752(a)(1) and (b)(1)(A), Engaging in Acts of Physical Violence in any Restricted Buildings or Grounds with a Deadly or Dangerous Weapon, in violation of 18 U.S.C. § 1752(a)(4) and (b)(1)(A), and Act of Physical Violence in the Capitol

2

Grounds or Buildings, in violation of 40 U.S.C. § 5104(e)(2)(F).

On May 17, 2022, the defendant pleaded guilty without an agreement to Count Two of the indictment, charging Civil Disorder. Sentencing on that count is set for September 8, 2022 before this Court. The remaining counts of the indictment are pending.

### B. Factual Background

#### i. Background on January 6, 2021

On January 6, 2021, a joint session of the United States Congress convened at the United States Capitol. The U.S. Capitol is secured 24 hours a day by U.S. Capitol Police. Restrictions around the U.S. Capitol include permanent and temporary security barriers and posts manned by U.S. Capitol Police. Only authorized people with appropriate identification are allowed access inside the U.S. Capitol. On January 6, 2021, the exterior plaza of the U.S. Capitol was also closed to members of the public. During the joint session, elected members of the United States House of Representatives and the United States Senate were meeting in the United States Capitol to certify the vote count of the Electoral College of the 2020 Presidential Election, which had taken place on November 3, 2020. The joint session began at approximately 1:00 p.m. Shortly thereafter, by approximately 1:30 p.m., the House and Senate adjourned to separate chambers to resolve a particular objection. Vice President Mike Pence was present and presiding, first in the joint session, and then in the Senate chamber.

As the proceedings continued in both the House and the Senate, and with Vice President Mike Pence present and presiding over the Senate, a large crowd gathered outside the U.S. Capitol. As noted above, temporary and permanent barricades were in place around the exterior of the U.S. Capitol building, and U.S. Capitol Police were present and attempting to keep the crowd away from the Capitol building and the proceedings underway inside.

At approximately 1:00 p.m., a crowd of violent rioters assembled on the West Front of the U.S. Capitol. U.S. Capitol Police formed a line of bike racks extending from the north end of the West Front to the south end to act as a barrier against the crowd. Officers were standing watch behind this line and fending off repeated attempts by the rioters to pull on the bike racks, either with their hands or with ropes and straps.

At such time, the certification proceedings were still underway and the exterior doors and windows of the U.S. Capitol were locked or otherwise secured. Members of the U.S. Capitol Police attempted to maintain order and keep the crowd from entering the Capitol; however, shortly after 2:00 p.m., individuals in the crowd forced entry into the U.S. Capitol, including by breaking windows and by assaulting members of the U.S. Capitol Police, as others in the crowd encouraged and assisted those acts.

Shortly thereafter, at approximately 2:20 p.m. members of the United States House of Representatives and United States Senate, including the President of the Senate, Vice President Mike Pence, were instructed to—and did—evacuate the chambers. Accordingly, the joint session of the United States Congress was effectively suspended until shortly after 8:00 p.m. Vice President Pence remained in the United States Capitol from the time he was evacuated from the Senate Chamber until the sessions resumed.

During national news coverage of the aforementioned events, video footage which appeared to be captured on mobile devices of persons present on the scene depicted evidence of violations of local and federal law, including scores of individuals inside the U.S. Capitol building without authority to be there.  Photographs and videos of several of these persons were disseminated via social media and other open-source online platforms.

> ii.     *The investigation and the defendant's attire on January 6, 2021.*

Open-source photography from outside of the Capitol Building on January 6, 2021 shows a man, who Hamner has admitted is him, wearing a "Guns Don't Kill People, Clintons Do" sweater and a black helmet with "S1" in white on the side, as depicted in *Figure One* below:



*Figure One*

Open-source video shows the initial breach of the police line at approximately 1:00 pm at the Peace Monument.  As rioters stream into the restricted area, the video shows Hamner breach a fence line to the south and begin to tear down fencing keeping people away from the Capitol. Hamner pulls down the fence even as a near-by woman repeatedly pleads, "Stop it!  Stop it! This is wrong.  This is going to get us in trouble.  You guys are wrong," as depicted in *Figure Two* below:



*Figure Two*

        iii.       *The defendant's interactions with law enforcement on January 6, 2021.*

An open-source photo from January 6, 2021, depicts Hamner fighting with officers from the U.S. Capitol Police and D.C. Metropolitan Police, who were assisting U.S. Capitol Police at the time, over a police barricade on the West Plaza, as depicted in *Figure Three* below. Also noteworthy, between the time he jumped the barricades onto Capitol Grounds, *supra,* and when he engaged with police, *infra,* Hamner donned a helmet:

6



*Figure Three*

At approximately 1:40 pm, as officers continued to fend off repeated attempts by rioters to breach the police line and assault the officers, the rioters moved a large metal "TRUMP" sign. As shown on an officer's body-worn camera, Hamner helped use the sign as a battering ram against the defensive line of officers, as depicted in *Figures Four* through *Seven* below. It is for this action that Hamner has pled guilty to Civil Disorder.



*Figure Four*

7


*Figure Five*


*Figure Six*



*Figure Seven*

      iv.      *The defendant's arrest.*

As the defendant was taken into custody in Colorado Springs on November 9, 2021, a bystander recorded the arrest and posted the recording to YouTube. In the video, the defendant yelled to a woman that his arrest was for "The January 6th event. I was there." Additionally, the defendant told officers, "You're lucky I ain't runnin' and making you guys go through hell right now. Just look at my rap sheet. I'm a runner and I'm a fighter, but ain't that today because I know I've been doing right."

A search of the defendant's residence resulted in police locating the "Guns Don't Kill People, Clintons Do" sweater he wore on January 6.

      v.      *Pretrial services in District of Colorado recommends detention.*

After Hamner made his initial appearance in Colorado, pretrial services in Colorado recommended that Hamner be detained pending trial, based in part on Hamner's violent criminal history, his criminal activity while under supervision, his history of failing to appear, his substance abuse history, and the nature of the instant offense.

9

Following a contested detention hearing on November 15, 2021, the Magistrate Judge in the District of Colorado ordered Hamner detained. *See* Dist. of Colorado, 1:21-mj-186-SKC, *Courtroom Minutes* November 15, 2021 and Dkt. No. 11.

## II.     ARGUMENT

### A.     Applicable statutory authority

The defendant cites 18 U.S.C. § 3145 as the authority for his release review. However, the defendant has pled guilty to a felony charge, civil disorder, in violation of 18 U.S.C. § 231(a)(3) and is awaiting sentencing. Accordingly, the analysis is done with the backdrop of 18 U.S.C. § 3143(a)(1), which directs that "the judicial officer shall order that a person who had been found guilty of an offense and who is awaiting imposition or execution of sentence….be detained unless the judicial officer finds by clear and convincing evidence that the person is not likely to flee or pose a danger to the safety of any other person or the community if release." "It is reasonably clear that section 3143(a)(1) requires a court to make the same flight risk and dangerousness assessment that the Bail Reform Act requires, only, now, detention is presumed, and it is the defendant's burden to convince the court that he satisfies the non-dangerousness and no-flight-risk conditions of release." *United States v. Wiggins,* ---F.Supp.3d---, 2020 WL 1868891, at *4 (D.D.C. April 10, 2020) (internal citations omitted); *see also United States v. Chansley,* 2021 WL 4133655, at *2 (D.D.C. September 10, 2021) ("Now the *defendant* must convince the Court that he is neither a flight risk nor a danger to the safety of others or the community") (emphasis in original).

As the legislative history of the 1984 Bail Reform Act ("BRA") amendments shows:

> [T]he language referring to the safety of the community refers to the danger that the defendant might engage in criminal activity to the detriment of the community. The committee intends that the concern about safety be given a broader construction than merely danger of harm involving violence. . .

*See* S.Rep. No. 225, 98th Cong., 2d Sess. 307, reprinted in 1984 U.S. Code Cong. & Ad. News 3182, 3195-3196. [2]

Danger to the community alone is sufficient reason to order pretrial detention. *United States v. Salerno*, 481 U.S. 739, 755 (1987). So is the risk the defendant will fail to appear in court as required. A finding that no conditions would reasonably assure the defendant's appearance as required must be supported only by a preponderance of the evidence. *United States v. Xulam,* 84 F.3d 441, 442 (D.C. Cir. 1996).

Under 18 U.S.C. § 3142(g), the judicial officer shall similarly consider whether there are conditions of release that will reasonably assure the appearance of the person as required and the safety of any other person and the community – an inquiry that considers (1) the nature and circumstances of the offense charged, (2) the weight of the evidence, (3) his history and characteristics, and (4) the nature and seriousness of the danger posed by his release.

---

[2] To that end, it is worthwhile recalling Congress' intent in 1984 when it enacted the current version of the Bail Reform Act:

> Many of the changes in the Bail Reform Act reflect the . . . determination that Federal bail laws must . . . give the courts adequate authority to make release decisions that give appropriate recognition to the danger a person may pose to others if released. . . . The constraints of the Bail Reform Act fail to grant the Courts the authority to impose conditions of release geared toward assuring community safety, or the authority to deny release to those defendants who pose an especially grave risk to the safety of the community. . . . *This broad base of support for giving judges the authority to weigh risks to community safety in pretrial release decisions is a reflection of the deep public concern, which the Committee shares, about the growing problem of crimes committed by persons on release.*

See S.Rep. No. 225, 98th Cong., 2d Sess. 307, reprinted in 1984 U.S. Code Cong. & Ad. News 3182, 3486-3487. (Emphasis added.)

11

Detention is appropriate here because no combination of conditions will assure the defendant's appearance as required or that the defendant will not pose a danger to the safety of the community and the defendant has failed to meet his burden of rebutting the presumption of detention.

### B. The factors under 18 U.S.C. § 3142(g) weigh in favor of detention.

All four factors under 18 U.S.C. militate in favor of the defendant's continued detention under both the clear-and-convincing standard applicable where (as here) a defendant is a danger to the community and the preponderance-of-the-evidence standard applicable where (as here) a defendant poses a flight risk.

#### i. *The Nature and Circumstances of the Offense*

The defendant's crimes are serious and cannot be viewed in isolation—he was one of thousands of individuals who descended upon the Capitol on January 6 to obstruct a cornerstone process of our democracy. The defendant wasn't just a part of the crowd or someone who got caught up in the moment. He travelled to Washington, D.C. with, and donned, a tactical helmet. He was one of the first to breach the fence line at approximately 1:00 pm on the West Front. The defendant did not stop with words on January 6; he attacked the line of police officers with a metal sign so large it was on wheels and took multiple people to lift it.  He and others used this sign as a battering ram against the line of police with the intent to harm them.

The Chief Judge has outlined specific offense characteristics that serve as guideposts relevant to assessing the comparative culpability of each defendant in relation to the other rioters. *United States v. Chrestman*, No. 21-MJ-218 (ZMF), 2021 WL 765662, at *7 (D.D.C. Feb. 26, 2021). Almost all of the *Chrestman* factors put the defendant in a more serious category and demonstrate his dangerousness. First, he has been charged with- and indeed, at this point,

12

pled guilty to- a felony. Second, he engaged in prior planning before arriving at the Capitol. As his attire shows, the defendant came to Washington, D.C. not with the intention of peacefully protesting, but to participate in conflict and he dressed for violence. When given the opportunity, he pulled down barriers and attacked police. "These motives and steps taken in anticipation of an attack on Congress speak volumes to both the gravity of the charged offense, as a premeditated component of an attempt to halt the operation of our democratic process, and the danger a defendant poses not just to the community in which he resides, but to the American public as a whole." *Id.* at *8.

Third, the defendant's words and movements demonstrated a dangerous hostility to law enforcement. Violent or threatening conduct toward law enforcement officers implicates "[g]rave concerns." *Id.* The defendant stayed near the front line, opportunistically attacking police and pulling away what little protection the police had from the rioters.

Although there is no evidence the defendant coordinated with others in advance of January 6, he certainly acted collectively with a cohort once he arrived on Capitol grounds by heaving the weaponized sign into police. Other individuals charged for battering police with the same sign have been ordered detained. *See United States v. Padilla,* 21-cr-214 and *United States v. Neefe,* 21-cr-567-1. The nature and circumstances of his offenses therefore weigh in favor of detention. Additionally, someone who demonstrates such contempt for the rule of law cannot reasonably be expected to make future court appearances.

      *ii.*  *The Weight of the Evidence Against the Defendant*

The weight of the evidence against the defendant is strong, and weighs in favor of detention. Indeed, he has already entered a guilty plea to one felony count of the indictment. The defendant is captured on video repeatedly engaging in conduct to obstruct and assault

13

officers. First, he removed fencing that had been placed to protect the Capitol, clearing the way for thousands of others to approach the Capitol. Next, he is captured on body-worn camera helping to push a large metal sign into a line of police officers who were protecting the Capitol, and then he is seen grabbing and lifting a metal bike rack barrier and wrestling with officers over the barrier. The clothes he is wearing while he assaults officers matches clothing found at his home. Specifically, police recovered the "Guns Don't Kill People; Clintons Do" sweater and the helmet with "S1" on the side from the defendant's home. A witness recognized the defendant in the videos and/or photos. Collectively, there is strong evidence of guilt and convictions on the remaining counts are likely.

### iii.     The History and Characteristics of the Defendant

Perhaps the most significant factor weighing in favor of detention is the defendant's criminal history, which is marked by ten prior convictions, including four felony convictions, as follows:

*California*

- 1992- conviction for misdemeanor prostitution (3 years probation)
- 1993- conviction for felony taking vehicle without consent and receiving known stolen property (180 days jail/3 years probation)
- 1994- conviction for misdemeanor possession of a controlled substance (3 years probation)
- 2001- conviction for DUI and obstructing/resisting officer (9 days jail/3 years probation)
- 2003- conviction for felony possession of explosive, felony cultivation of marijuana, and misdemeanor possession of controlled substance paraphernalia (180 days jail, 3 years probation) (conviction set aside on 3/3/21 pursuant to California Health and Safety Code 11361.8, allowing for resentencing or dismissal under California's Control, Regulate and Tax Adult Use of Marijuana Act)
- 2003- conviction for misdemeanor driving with suspended license (10 days jail, 3 years probation)
- 2003- violation of probation (54 days jail)
- 2005- conviction for felony force/assault with deadly weapon not firearm: great bodily injury likely (1 year jail, 3 years probation)
- 2006- conviction for misdemeanor DUI and driving w/o interlock device (73 days jail, 3

       years probation)
2006- violation of probation (2 years prison)
2010- conviction for felony inflicting corporal injury on spouse (240 days jail, 3 years
       probation)

*Colorado*

2014- conviction for misdemeanor resisting arrest and obstructing police (45 days jail)

The defendant's criminal history shows both an alarming contempt for the rule of law and a significant proclivity to use violence. He spent the better part of twenty years on probation and constantly reoffended by committing new crimes. The defendant cannot be expected to comply with conditions of release given his history of noncompliance with probation.

He has twice been convicted of resisting arrest, including in 2014 when he ignored a police officer who attempted to pull him over for failing to use a turn signal. Rather than comply, the defendant walked to his house, forcing the police officer to tackle the defendant to the ground and fight for control of the defendant's arms. The defendant placed his hands behind his back only when the officer drew his Taser and advised the defendant he was going to Tase him if he did not comply. The defendant told the officer he was resisting because he thought he had a warrant from California.

In fact, the defendant did have an open arrest warrant from San Bernardino County, California dating back to August 10, 2011 for violating probation by failing to appear for a probation review hearing. This represented the second failure to appear warrant issued against the defendant for violating this particular term of probation. It was an in-state warrant only and is not extraditable from other states. Clearly, the defendant was aware of this warrant. Still, he took no steps to address the matter other than sending a letter in October 2020 which did nothing to resolve it. Instead, he willfully ignored the violation for ten years. When faced with the

15

possibility of addressing the warrant through arrest in 2014, he forcibly resisted law enforcement. On November 9, 2021, when told he was being arrested on a warrant he replied to the officer, "you know it's a non-extraditable one?"

Additionally, in that same resisting arrest case from Colorado in 2014, the defendant was twice charged with failing to appear in court. In 2012 and again in 2013, the defendant failed to appear in court in Colorado on traffic charges, including a misdemeanor charge. The defendant's criminal history demonstrates a significant risk of non-appearance. This risk was reinforced by the defendant himself on the day of his arrest in the instant case when he advised agents, "You're lucky I ain't runnin' and making you guys go through hell right now. Just look at my rap sheet. I'm a runner and I'm a fighter, but ain't that today because I know I've been doing right." This statement was captured on a video recording of the defendant's arrest made by a bystander and on police body camera. In sum, the defendant has failed to appear for court resulting in the issuance of warrants at least six times.

In addition to the crimes for assaulting the police here, the defendant has been previously convicted of felony force/assault with a deadly weapon (not firearm) with great bodily injury likely in California in 2005 for which he received one year in jail and three years on probation. The defendant assaulted his then-wife by placing a pillow over her face until she nearly passed out and broke her phone in half when she attempted to call 911. The police subsequently found the broken cell phone in the defendant's vehicle.

The defendant has also been convicted of felony inflicting corporal injury on a spouse in California in 2010 for which he received nine months in jail and three years on probation. In that case, the defendant headbutted his wife in the face at a casino and when she reported it to a Tribal Police Officer minutes later, the defendant fled on foot and jumped a wall into a private

residence's yard to avoid being arrested.

When the defendant's actions on January 6 are juxtaposed with his violent criminal history, apparent disdain for authority and the rule of law, and his history of noncompliance with probation, it is clear this factor weighs heavily in favor of detention.

                *iv.*      *The Nature and Seriousness of the Danger to any Person or the Community*

The defendant's actions at the Capitol alone make him a serious risk of danger to the community. The D.C. Circuit has drawn a distinction between violent and non-violent participants in the Capitol riots, with the former being in a "different category of dangerousness." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir.). In fact, the court in *Munchel* specifically named those who assaulted police officers as falling into the category of elevated dangerousness. *Id; see also United States v. Hale-Cusanelli,* 2021 WL 2816245, at *6 (D.D.C. July 7, 2021). (affirming detention order where District Court found Capitol riot defendant's '"conduct in this case made me concerned that he was perhaps looking to act on these violent tendencies and violent comments in the past'"). Other courts in this district have made the same observation. "Indeed, if any crime establishes danger to the community and a disregard for the rule of law, assaulting a riot-gear-clad police officer does." *United States v. Fairlamb*, No. 1:21-CR-120-RCL, 2021 WL 1614821, at *5 (D.D.C. Apr. 26, 2021). These factors measure the extent of a defendant's disregard for the institutions of government and the rule of law, qualities that bear on both the seriousness of the offense conduct and the ultimate inquiry of whether a defendant will comply with conditions of release meant to ensure the safety of the community. Given the defendant's violent criminal history, disdain for authority and repeated use of force against law enforcement in instances outside January 6, the defendant's risk of danger extends beyond his actions on January 6. Accordingly, the defendant's release poses a danger to the community and this factor weighs in favor of

detention.

### C. The defendant has failed to meet his burden under 18 U.S.C. § 3142(i).

Separate from Section 3145(b), 18 U.S.C. § 3142(i) provides a mechanism for a detained defendant's release if it is "necessary for preparation of the person's defense or for another compelling reason." *See* 18 U.S.C. 3142(i). "It is beyond cavil that '[a] defendant has the burden of showing that temporary release is 'necessary' under Section 3142(i)." *United States v. Lee,* No. 19-CR-298 (KBJ), 451 F.Supp.3d 1, 5 (D.D.C. March 30, 2020) (quoting *United States v. Dupree*, 833 F.Supp2d 241, 246 (E.D.N.Y. 2011). The defendant must show that "(1) he would be released to 'an appropriate person' and (2) that his temporary release is 'necessary for' a 'compelling reason.'" *United States v. Riggins,* No. 20-CR-10 (CKK), 456 F.Supp.3d 138, 149 (D.D.C. April 27, 2020).

In support of his motion under Section 3142(i), the defendant claims there is no attorney-client phone line at the jail, he's been threatened by gang members, and his father's failing health as reasons compelling his release.

Turning to the first factor, the defendant has offered no evidence, especially in light of his history of violence against his domestic partners, that his wife is an "appropriate person" under Section 3142(i). *Id.* at 150. *See also United States v. Leake*, No. 19-CR-194 (KBJ), 2020 WL 1905150, at *4 (D.D.C. Apr. 17, 2020) (explaining that it was not clear that mother of defendant's child was not clearly appropriate person under section 3142(i)); *United States v. Armstead*, No. CR 18-00357 (APM), 2020 WL 1821130, at *1 (D.D.C. Apr. 10, 2020) (finding that defendant had not shown that mother would be appropriate person); *United States v. Lee*, *supra*, 7 (same).

With respect to defendant's proffered "compelling reasons," Central Virginia Regional Jail offers in-person, contact meetings between defendant and counsel or video visitation through a

non-recorded kiosk. If the defendant has been threatened, the facility can take, and reportedly has taken, measures to keep him safe, including moving him to a part of the facility separate from those who have allegedly threatened him. Finally, the defendant cites his father's failing health. While some courts have granted release under Section 3142(i) when *the defendant* has a serious underlying health issue, considering the COVID-19 pandemic, s*ee United States v. Thomas,* 456 F.Supp.3d 69, 78-79 (D.D.C. Apr. 20, 2020), the health issues of a third party cannot mean the defendant's release is necessary. Accordingly, the defendant's motion should be denied.

### III.     CONCLUSION

For the reasons explained here, the United States respectfully requests the Court deny the defendant's motion for release pending trial. He has failed to meet his burden to overcome the presumption of detention under 18 U.S.C. § 3143(a)(1). Even so, there is clear and convincing evidence that the defendant would pose a danger to the community if released, and that there are no release conditions or combination of conditions that would ensure the safety of the community. Further, there is also a preponderance of evidence that the defendant would be a flight risk and would not appear at trial or his sentencing proceeding as required. Finally, defendant has failed to meet his burden under 18 U.S.C. § 3142(i) to show release to an appropriate person is necessary for a compelling reason.

                                                Respectfully submitted,

                                                MATTHEW M. GRAVES
                                                UNITED STATES ATTORNEY

                                                */s/Douglas G. Collyer*
                                                DOUGLAS G. COLLYER
                                                Assistant United States Attorney
                                                District of Columbia Detailee
                                                N.D.N.Y. Bar 519096
                                                U.S. Attorney's Office
                                                14 Durkee Street, Suite 340
                                                Plattsburgh, NY 12901
                                                (518) 314-7800
Date: July 5, 2022                         Douglas.Collyer@usdoj.gov

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of this opposition was sent to counsel for the defendant, Nicholas Smith, on July 5, 2022, via CM/ECF and/or by email.

                                                /s/
                                               Douglas G. Collyer