## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| v. | ) | |
| THOMAS PATRICK HAMNER, | ) | Crim. Action No. 21-0689 (ABJ) |
| Defendant. | ) | |

## ORDER

Defendant has filed a motion "to revoke or amend his detention order such that he may be temporarily released pending sentencing." Def. Hamner's Mot. for Revocation/Amendment of Deten. Order. [Dkt. # 22] ("Mot.") at 1. The government opposes the motion. Gov't Resp. in Opp. to Mot. [Dkt. # 24] ("Opp."). The Court understands that the defendant has a sincere desire to spend time with his father, and that his father's condition is undeniably grave. At this point in the case, though, the Bail Reform Act requires that a judicial officer "*shall* order that a person who has been found guilty of an offense and who is awaiting imposition . . . of sentence . . . be detained, *unless* the judicial officer finds by clear and convincing evidence that the person is not likely to fell or pose a danger to the safety of the community or any other person if released." 18 U.S.C. § 3143(a)(1) (emphasis added). Given the defendant's history, the nature of the charges, and his own statements, the Court cannot make the necessary finding in this case, and after close consideration of all of the circumstances and statutory factors, the motion is **DENIED**.

## BACKGROUND

Defendant is charged in a six-count indictment with offenses related to his presence in the United States Capitol building on January 6, 2021:

- Count One:  Assaulting, Resisting, or Impeding Certain Officers Using a Dangerous Weapon and Aiding and Abetting, in violation of 18 U.S.C. § 111(a)(1) and (b) and 2.

- Count Two:  Civil Disorder and Aiding and Abetting, in violation of 18 U.S.C. § 231(a)(3) and 2.

- Count Three:  Civil Disorder and Aiding and Abetting, in violation of 18 U.S.C. § 231(a)(3) and 2.

- Count Four:  Entering and Remaining in a Restricted Building, in violation of 18 U.S.C. § 1752(a)(1) and (b)(1)(A).

- Count Five:  Engaging in Physical Violence in a Restricted Building or Grounds with a Deadly or Dangerous Weapon, in violation of 18 U.S.C. § 1752(a)(4) and (b)(1)(A).

- Count Six:  Act of Physical Violence in the Capitol Grounds or Buildings, in violation of 40 U.S.C. § 5104(e)(2)(F).

Indictment [Dkt. # 6].

On May 17, 2022, defendant entered a plea of guilty to Count Two.  *See* Min. Entry (May 17, 2022).  There was no plea agreement between the parties, and the other five counts remain pending.  *Id.*

The general events of January 6, 2021 are well known at this point and they will be summarized briefly.  On this date, a joint session of Congress was convened at the Capitol; Congress was meeting to certify the results of the 2020 Presidential Election.  Vice President Mike Pence was presiding over the session.

A large group of individuals descended on the Capitol grounds in the early afternoon, eventually making their way past barricades and police officers and into the building.  The attack on the Capitol caused the House and Senate to suspend proceedings as members were spirited away to safety.  Police officers were assaulted, the rioters engaged in extensive property damage, and several people died in the ensuing chaos.

2

On that day, Hamner arrived at the Capitol grounds wearing a sweater with the words "Guns Don't Kill People, Clintons Do" emblazoned across the chest, as well as a black helmet. Opp. at 5.  The government alleges that Hamner then "beg[a]n to tear down fencing keeping people away from the Capitol."  *Id.*; *see also* United States' Notice of Information in Preparation for May 17, 2022 Plea Hearing [Dkt. # 19] ("Plea Notice") at 7 ("Hamner hopped over the barricades on the West Lawn and began pulling them down.").  The government has submitted photographs of "Hamner fighting with officers . . . over a police barricade," and it points out that he put the helmet on between entering the grounds and engaging with police.  Opp. at 6.

The government also attached photographs to its opposition that, in its words, show Hamner using "a large metal 'TRUMP' sign . . . as a battering ram against the defensive line of officers."  *Id.* at 7–9.  But the Court need not rely on still photographs alone; at the time of the defendant's plea, the government provided the Court with two videos of this incident and defendant agreed that the videos fairly and accurately depicted the event.  Draft Tr. of Change of Plea Hr'g at 7, United States v. Hamner, No. 21-cr-689 (D.D.C. May 17, 2022).   One is from an officer's body worn camera in which Hamner can be seen helping to carry or press the sign – which was still attached to a large wheeled foundation – forward and thrusting it into the line of officers, while the other is shot from a cell phone and depicts the same event from above, showing the police line being disrupted by the crowd's pushing the sign into the officers.  Ex. 1 [Dkt. # 18].

Defendant disputes the government's characterization of his role as "us[ing] the sign as a 'battering ram;'" in his version, he "lifted up his hands and guided a corner of the billboard just as

it crossed the [police] line." Def. Hamner's Resp. to Plea Notice [Dkt. # 20] ("Plea Notice Resp.") at 1–2.[1]

The government also reports that when defendant was arrested and taken into custody in Colorado Springs, he "yelled" to a bystander that he was being arrested for "[t]he January 6th event. I was there." Opp. at 9. He reportedly told officers during the arrest: "You're lucky I ain't runnin' and making you guys go through hell right now. Just look at my rap sheet. I'm a runner and I'm a fighter, but ain't that today because I know I've been doing right." *Id.*

After defendant was arrested on November 9, 2021, Arrest Warrant [Dkt. # 5], a detention hearing was held in the United States District Court for the District of Colorado, and he was ordered detained. Order of Deten. Pending Trial, Ex 1 to Mot. [Dkt. # 22-1] ("Deten. Order"). The Magistrate Judge found by clear and convincing evidence that no condition or combination of

---

1       Defendant's full statement was that:

> What the evidence shows instead is a sizeable group of protesters carrying the large billboard above their heads as though it were a person "crowd surfing" at a concert. The billboard moved toward the police line at a slow, lumbering pace that was visible to the officers for quite some time. The evidence shows that Hamner approached one corner of the billboard shortly before it crossed over onto the upraised hands of the officers on the other side of the police line. That is, Hamner was not a part of the group responsible for moving the billboard up to the point of the "defensive line." Hamner lifted up his hands and guided a corner of the billboard just as it crossed the line. At no point did Hamner "throw" the billboard or use it as a "battering ram." It was too large for any person to "throw." At no point did the billboard fall on the officers, who within a matter of seconds placed the object on the ground. The government has represented to Hamner's counsel that no officer was injured in this incident.

Plea Notice Resp. at 2. This ruling is not based on a finding that the defendant threw the sign; that is not depicted in the video. However, the billboard did not "move[] toward the police line" on its own; it was plainly being used in an aggressive, offensive manner to disrupt or dislodge the line of officers, and the defendant plainly participated, albeit close to the end of its journey.

conditions of release would reasonably assure the safety of any other person and the community, and by a preponderance of evidence that no condition or combination of conditions of release would reasonably assure the defendant's appearance as required. *Id.* at 3. The checked boxes on the Order reflects the following findings: (1) the weight of the evidence was strong; (2) defendant was subject to a lengthy period of incarceration if convicted; (3) defendant had prior criminal history; (4) defendant participated in criminal activity while on probation, parole, or supervision; (5) defendant had a history of violence or use of weapons; (6) there were prior failures to appear in court as ordered; and (7) there were prior violations of probation, parole, or supervised release. *Id.* at 3–4. In the narrative portion of the order, the Magistrate Judge further explained:

> [T]he photographs at pages four and five of the Statement of Facts supporting the Criminal Complaint plainly show this defendant using large metal objects to violently engage law enforcement officers who were attempting to secure the U.S. Capitol. The evidence the Defendant traveled to the U.S. Capitol with his tactical/skateboard helmet suggests pre-planned activity on his part to engage in violence that day. The evidence shows Defendant engaged in violence directed at law enforcement in a manner not suggestive of someone who simply got caught up in the moment.
>
> When Defendant was arrested on these charges, he reportedly told law enforcement, "You're lucky I ain't running. I'm a runner and a fighter." In the Court's view, these statements confess the danger and flight risk posed by this Defendant. He further reportedly told law enforcement at the time of his arrest that he wasn't fighting or running "because what I did was right. I was trying to protect you guys." Whether or not one agrees with this statement, the notion this Defendant views his conduct in physically and violently impeding law enforcement's efforts to secure the U.S. Capitol as doing the "right" thing further evidences the danger and flight risk he poses.
>
> The Defendant's California-absconder status is also a factor favoring detention. He has only now, after his arrest in this case, attempted to address that issue. And finally, Defendant was arrested in El Paso County in 2014 for resisting arrest and obstructing a peace officer under circumstances involving a "tussle" with police and his being tackled by them. He was found guilty of these crimes in 2015. This prior conduct, coupled with the underlying charges here, demonstrates a pattern of this Defendant defying law enforcement authority.

*Id.* at 4.

## LEGAL STANDARD

Defendant asserts in his motion that "the government must prove by 'clear and convincing evidence' that 'no condition or combination of conditions will reasonably assure the safety of any other person and the community.'" Mot. at 3, citing 18 U.S.C. § 3142(f). But that standard is for pretrial defendants who are "charged with an offense," *id.* § 3142(a), not defendants who have already pled guilty to a crime. This defendant has pled guilty to Count Two and is awaiting sentencing on that charge. *See* Min. Entry (May 17, 2022); *see also* Min. Order (June 16, 2022) ("On May 17, 2022, the defendant entered a plea of guilty to Count Two, and sentencing is scheduled for September 8, 2022"). Therefore, his request for release is governed by 18 U.S.C. § 3143(a):

> [T]he judicial officer shall order that a person who has been found guilty of an offense and who is awaiting imposition or execution of sentence . . . be detained, unless the judicial officer finds by clear and convincing evidence that the person is not likely to flee or pose a danger to the safety of any other person or the community if released under section 3142(b) or (c). If the judicial officer makes such a finding, such judicial officer shall order the release of the person in accordance with section 3142(b) or (c).[2]

When making a bond determination under the Bail Reform Act, the Court must consider: (1) "the nature and circumstances of the offense charged, including whether the offense is a crime of violence," (2) "the weight of the evidence against the [defendant]," (3) "the history and characteristics of the [defendant]," and (4) "the nature and seriousness of the danger to any person or the community that would be posed by the person's release." 18 U.S.C. § 3142(g). In the pretrial context, this is a forward-looking inquiry; "a defendant's detention based on dangerousness

---

2    Subsections 3142(b) and (c) detail conditions of release that the Court may impose.

accords with due process only insofar as the district court determines that the defendant's history, characteristics, and alleged criminal conduct make clear that he or she poses a concrete, prospective threat to public safety." *United States v. Munchel*, 991 F.3d 1273, 1280 (D.C. Cir. 2021); *see United States v. Salerno*, 481 U.S. 739, 752 (1987).

Finally, although the D.C. Circuit has not yet addressed the issue, courts in this district and many other circuits agree that the district judge should review *de novo* a detention decision rendered by a Magistrate Judge. *See, e.g.*, *United States v. Hassanshahi*, 989 F. Supp. 3d 110, 113 (D.D.C. 2013); *United States v. Koenig*, 912 F.2d 1190, 1191 (9th Cir. 1990) (collecting cases); *United States v. Stewart*, 19 F. App'x 46, 48 (4th Cir. 2001); *United States v. Gonzales*, 149 F.3d 1192 at *2 (10th Cir. 1998); *United States v. Hazime*, 762 F.2d 34, 36 (6th Cir. 1985); *United States v. Portes*, 786 F.2d 758, 761 (7th Cir. 1985).  The Court will follow that procedure in this case.

## ANALYSIS

### a.  Nature and circumstances of the offense

Defendant is charged with serious crimes related to his actions on January 6, and he has already pled guilty to Civil Disorder and Aiding and Abetting, in violation of 18 U.S.C. § 231(a)(3) and 2.  *See* Min. Entry (May 17, 2022).  He has pled guilty to a felony offense, and additional felony offenses remain pending.  *Id.*

On January 6, defendant is alleged to have taken part in the effort to circumvent the police line and enter the Capitol grounds.  There is no dispute between the parties as to the basic circumstances of that day.  The Capitol was closed while a joint session of Congress was convened to certify the vote of the Electoral College in the 2020 Presidential Election in accordance with the United States Constitution.   Vice President Mike Pence was present and presiding, as the

Constitution required.  And then a group of people overwhelmed the officers, crossed the barriers placed in front of the crowd, and entered the building in the early afternoon.  Members of Congress and their staff were forced to flee and hide, and the session of Congress was interrupted.  Law enforcement officers – as well as members of the mob – were injured, and there was extensive property damage to the Capitol itself.

As the D.C. Circuit has emphasized, "[i]t cannot be gainsaid that the violent breach of the Capitol on January 6 was a grave danger to our democracy."  *Munchel*, 991 F.3d at 1284.

The inquiry, though, is not about the events of January 6 in general, but rather, about what this particular defendant is alleged to have done on that day.  And this defendant was not someone who was late to arrive and moved forward once barricades and doors were already breached.  Instead, defendant is alleged to have destroyed barriers himself.  Videos submitted by the government show him at the front of the mob during confrontations with police officers.  And defendant is depicted in photographs and videos engaged in several discrete actions to thwart officers' efforts that day; first, he removed barriers that had been placed between the crowd and the building, and second, he was part of the group that hoisted a large metal sign into the air and then propelled it into the line of officers.

In sum, defendant took active steps to advance not just himself, but the rest of the mob towards the Capitol, he confronted officers, and he was part of the vanguard.  Although this factor does not weigh as heavily as in cases where the defendant assaulted an officer more directly, was armed, or made violent threats before, during, or after January 6, the nature and circumstances of the offense to which he pled guilty and the other alleged offenses do weigh in favor of continued detention.

**b.  Weight of the evidence**

Courts in other circuits have cautioned that a district court assessing the weight of the evidence may not consider the evidence of a defendant's guilt, but must only consider only the weight of the evidence of defendant's dangerousness.  *United States v. Stone*, 608 F.3d 939, 948 (6th Cir. 2010); *see also United States v. Gebro*, 948 F.2d 1118, 1121 (9th Cir. 1991) (holding that section 3142(g) "neither requires nor permits a pretrial determination of guilt").  This defendant has already pled guilty to Count Two, so there is no dispute as to his guilt there, but the Court will still focus on the evidence of his dangerousness, especially as five counts remain to be adjudicated.

The weight of the evidence is strong.  Defendant took part in the earliest efforts to breach police lines protecting the Capitol building.  In doing so, he did not shy away from destroying property or confronting officers, shown most clearly by the defendant's participation in using the large, heavy sign against the police line.

Defendant acknowledged when he pled guilty that this occurred and that he is the person depicted in the government's video, but he attempts to minimize the risk to the officers by noting that no one was injured, that other people initially brought the sign forward, and that he merely "guided a corner of the billboard" when it was thrust into the police line.  Plea Notice Resp. at 2. But the videos submitted by the government make clear that the situation was not nearly as innocuous as defendant would have the Court believe.  Hamner may not have been the first person to pick up the sign, but he helps direct it towards the line of officers, tries to move other rioters out of the way of the sign, and not only carries it in that direction, but helps push it into the line of officers.  It was a group effort, but there was nothing accidental about defendant's participation. The sign was thrust into the line of officers in an attempt to break through the line at the very least, and defendant showed no regard for the safety of the officers, who easily could have been injured

given the size, weight, and momentum of the sign.  And the suggestion that defendant was merely a passive observer or a minimal participant is undermined not just by the video, but also by the allegations of other aggressive actions he took to remove the police barricades protecting the Capitol.

Given that defendant was not merely present on January 6, but was also captured in photographs and videos destroying property and confronting officers in an attempt to get into the building, the weight of the evidence is strong.

### c.  History and characteristics of the defendant

Defendant posits that his willingness to pledge financial resources ensuring his reappearance is a factor in his favor:

> His wife is willing to pledge as collateral the Hamner family home in Colorado, where their children live.  It is appraised at approximately $500,000.  The family will also post nearly all the cash they have at hand, $50,000.  If the Court deems these securities insufficient, Hamner's wife will refinance another house to raise the necessary funds (the Hamners jointly operate a real estate business).

Mot. at 3–4.  Defendant also argues that his willingness to plead guilty to a felony charge in this case "is a further demonstration of his willingness and ability to comply with this Court's orders to appear in these proceedings." *Id.* at 4.  He adds that his father is fighting life-threatening cancer and defendant wishes to visit with him. *Id.* at 2, 4.  And finally, defendant submits that he is in

danger in the jail because he is an unpopular inmate due to his connection with the events of January 6, and that threats have been made against him. *Id.* at 2.[3]

These are all important factors worthy of consideration, but as noted above, we are no longer at a point in these proceedings where it is the government that bears the burden to prove that conditions will not suffice. Also, it is important to underscore that even the pretrial standard for risk of flight requires only proof by a preponderance of the evidence. *See United States v. Vortis*, 785 F.2d 327, 328 (D.C. Cir. 1986). And here, the Court simply cannot ignore the significant evidence about defendant's history and characteristics that give rise to substantial concerns about both flight and dangerousness.

Defendant has a lengthy criminal history, including multiple felony convictions. The government's opposition lists the following convictions:

- 1992- conviction for misdemeanor prostitution (3 years probation)

- 1993- conviction for felony taking vehicle without consent and receiving known stolen property (180 days jail/3 years probation)

- 1994- conviction for misdemeanor possession of a controlled substance (3 years probation)

- 2001- conviction for DUI and obstructing/resisting officer (9 days jail/3 years probation)

- 2003- conviction for felony possession of explosive, felony cultivation of marijuana, and misdemeanor possession of controlled substance paraphernalia (180 days jail, 3 years probation) (conviction set aside on 3/3/21 pursuant to California Health and Safety Code 11361.8, allowing for resentencing or

---

[3]    To the extent the defense has more specific information concerning the risk to defendant's personal safety in his current placement, that information should be immediately provided to the government so that the circumstances can be investigated, and the U.S. Marshal can make an informed decision about where the defendant should be detained. In the Court's view, there are more appropriate means of providing protection from others than confining someone who has not personally engaged in any disciplinary infractions in the Special Housing Unit.

dismissal under California's Control, Regulate and Tax Adult Use of Marijuana Act)

- 2003- conviction for misdemeanor driving with suspended license (10 days jail, 3 years probation)

- 2003- violation of probation (54 days jail)

- 2005- conviction for felony force/assault with deadly weapon not firearm: great bodily injury likely (1 year jail, 3 years probation)

- 2006- conviction for misdemeanor DUI and driving w/o interlock device (73 days jail, 3 15 years probation)

- 2006- violation of probation (2 years prison)

- 2010- conviction for felony inflicting corporal injury on spouse (240 days jail, 3 years probation)

- 2014- conviction for misdemeanor resisting arrest and obstructing police (45 days jail)

Opp. at 14–15.

    While some of these convictions are old and some of the offenses are relatively minor, the record as a whole demonstrates a blatant disregard for the law and an ongoing resistance to submitting to law enforcement, to court supervision, and to appearing when summoned. *See* Opp. at 14–15 (defendant convicted of obstructing/resisting officer; driving with suspended license; violation of probation; violation of probation; misdemeanor DUI and driving w/o interlock device). Defendant has resisted arrest and regularly fails to show up for court. *See id*. at 15–17 (reporting two arrest warrants issued "for violating probation by failing to appear for a probation review hearing," two additional charges of failing to appear in court when facing his resisting arrest case in Colorado – which came about when defendant attempted to evade an officer and then "told the officer he was resisting because he thought he had a warrant from California" – and another

12

incident in which defendant "fled on foot and jumped a wall into a private residence's yard to avoid being arrested"). Moreover, defendant committed many of these crimes while on probation for previous offenses; as the government puts it, "[h]e spent the better part of twenty years on probation and constantly reoffended by committing new crimes." *Id.* at 15.

Defendant's record also includes at least two convictions involving physical violence or the threat of it (felony force/assault with deadly weapon not firearm: great bodily injury likely; felony inflicting corporal injury on spouse). Opp. at 14–15. The government reports that his conviction for inflicting corporal injury was based on his "headbutt[ing] his wife in the face at a casino," and his conviction of "assault with a deadly weapon . . . great bodily injury likely" stemmed from an attack in which "defendant assaulted his then-wife by placing a pillow over her face until she nearly passed out and broke her phone in half when she attempted to call 911." *Id.* at 16.

All of this would be concerning enough on its own, but the concern is intensified by these same attitudes being on full display January 6 and thereafter. Defendant disregarded law enforcement at the Capitol by attempting to circumvent and destroy barriers, and then helped a group try to overcome the police line by pushing a large metal sign into them. And at the time of his arrest in this case, he proclaimed: "You're lucky I ain't runnin' and making you guys go through hell right now. Just look at my rap sheet. I'm a runner and I'm a fighter." Opp. at 16. Given defendant's history of violence and his disregard for law enforcement and court supervision, this factor weighs powerfully in favor of defendant's continued detention. *See Munchel*, 991 F.3d at 1281 (finding "a defendant's potential for compliance with release conditions relevant to the detention inquiry").

13

### d. Nature and seriousness of the danger to any person or the community

This factor brings the Court back to the overall inquiry; is there a danger to any person or the community if defendant is released?

Defendant poses a clear danger to the community if he is released. He has been violent towards police officers and his partners. He was no tag-along on January 6, but was at the forefront of the assault on the Capitol, and he made efforts to remove barriers so that he and other rioters could move forward past the officers' defenses. The D.C. Circuit has made clear that January 6 defendants "who actually assaulted police officers and broke through windows, doors, and barricades . . . are in a different category of dangerousness." *Munchel*, 991 F.3d at 1284. Defendant is in that category of dangerousness. Especially given that the burden is on defendant, not the government, to show that he does not pose a danger by clear and convincing evidence, 18 U.S.C. § 3143(a), the level of danger to the community indicates that defendant should remain detained.

Moreover, defendant's criminal history indicates that he is likely to flee if given the opportunity. He has regularly attempted to evade officers, and his actions on January 6 show that his respect for law enforcement has not increased in the years since he ran from a casino after headbutting his wife and failed to cooperate when officers tried to pull him over in separate incidents. Opp. at 15–17. The seriousness of the charges in this case, defendant's lack of success on previous periods of release (including multiple probation violations), and defendant's own statements about his desire to "run" also contribute to this conclusion.

14

**CONCLUSION**

The Court cannot conclude by clear and convincing evidence that defendant does not pose a danger to the community or that he is unlikely to flee.  As a result, his motion is **DENIED** and defendant will remain detained pending sentencing on Count Two.


AMY BERMAN JACKSON
United States District Judge

DATE:  July 29, 2022