**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| | ) |
| v. | ) Case No. 21-cr-689-ABJ |
| | ) |
| THOMAS HAMNER, | ) |
| | ) |
| Defendant. | ) |

**SENTENCING MEMORANDUM OF THOMAS HAMNER**

# Table of Contents

Introduction ....................................................................................................... 1

Factual background ........................................................................................... 2

    A.    Hamner's background, family, and character ...................................... 2

    B.    The indictment, § 231(a)(3) conviction, PSR, and Guidelines calculation ... 4

Argument ............................................................................................................ 9

    I.    Sentencing procedure ......................................................................... 9

    II.    The § 3553(a) factors favor a downward variance ........................... 10

        A.    The nature and circumstances of the offense and the history and characteristics of the defendant (§ 3553(a)(1)) ............................ 10

            1.    The typical § 231(a)(3) prosecution does not look like Hamner's ... 10

            2.    Hamner's harsh pretrial confinement ............................ 16

            3.    Hamner's remorse ......................................................... 17

            4.    The deleterious effect on Hamner's children ................ 17

        B.    Avoiding unwarranted sentence disparities (§ 3553(a)(6)) ... 18

        C.    The seriousness of the offense and deterrence (§ 3553(a)(2)) ... 26

Conclusion ........................................................................................................ 26

**Introduction**

Thomas Hamner, 49, owns a successful business that he operates with his wife, Steffany, in Colorado.  Happily married for years, Tom and Steffany are raising four children between the ages of four and 17 years old.  Tom's trouble started when he decided to travel to Washington, D.C., to attend the former president's rally on January 6.

As the crowd descended on the Capitol Building, Tom made foolish decisions.  A group of protesters carried a large sign above their heads towards a thin line of police defending the Capitol.  Moments before the heavy object crossed over the police line and onto the upraised hands of law enforcement officers, Tom lent his strength to the reckless enterprise, guiding a corner of the sign.  The officers then placed it on the ground on the other side of the police barrier.

Tom deeply regrets his deplorable conduct.  Although no officer was injured in the sign incident, law enforcement was then struggling to subdue a riot.  Nearby, other protesters violently clashed with the police, a mob was forcing its way into the Capitol, and Congress was compelled to evacuate.  Tom takes full responsibility for interfering with law enforcement during a civil disorder, the crime to which he pleaded guilty.  He is ashamed by his conduct that disgraceful day.

Serious though his felony offense is, there are mitigating factors here.  Tom did not inflict bodily injury on these officers, nor was that his intent.  He has already served nearly a year of pretrial incarceration.  His pandemic-era conditions of confinement have been harsh to a degree unknown by the public.  On account of his status as a January 6 defendant, inmates have repeatedly threatened to kill Tom.  Consequently, he has been held for hundreds of hours in debilitating isolation.  His beloved father, sick with cancer, passed away a few weeks ago.  Tom

1

could not say goodbye.  Above all, his minor children will severely suffer in Tom's extended absence.  Already one of them has had to seek out psychological counseling as a result of her father's ordeal.   Taken together, a sentence of 16 months' incarceration, with credit for harsh time he has already served, would be sufficient but not greater than necessary to provide for a just punishment.  As shown below, a more severe sentence would create a number of unwarranted sentence disparities.

**Factual background**

>    **A.    Hamner's background, family, employment history, and character**

Born in California in 1973, Tom was adopted by Ben and Joyce Hamner.  He had a happy upbringing.  Tom was particularly close to his father.  In July this year, Ben passed away from cancer at the age of 79.  Joyce had died in 2016 due to medical complications.

As a teenager and young man, Hamner fell in with a bad crowd in Southern California. That led to the substance abuse and criminal history one sees in the presentence investigation report (PSR) dotting the 1990s and early 2000s.  Resolving to fully break with his bad habits and behavior, Hamner relocated to Colorado over a decade ago.  In 2015, he married his current spouse, Steffany.

Together Tom and Steffany built a family and a business, both successfully, in Colorado Springs.  Their marriage produced a four-year-old son, B.H.  Also part of the family are L.C., a 13-year-old, and D.O., a 17-year-old, children from Steffany's prior relationship.  Hamner is also a father to B.T.H., a nine-year-old from a prior relationship who spends his summers and Christmas with Tom and Steffany.[1]

---

[1] Tom also has two adult daughters, and Steffany one adult son, from prior relationships.  They do not live with the couple in Colorado.

From 2019, Tom and Steffany have owned and operated a successful home-remodeling business.  Hamner derives about $75,000 a year in income from the enterprise.  He had previously owned and operated a similar business under the name One by One Tile and Stone. Letters submitted in support of Hamner consistently cite the same positive qualities of his character.  Tom is "knowledgeable," "professional," "trustworthy," a man of "integrity," and "ethical" in business.[2]  Exh. 1, pp. 10-26.

Leslie Nordyke, the CPA for the Hamner business, goes into more detail.  What impresses her the most is how the couple "and specifically Tom, take care of their employees." Exh. 1, p. 25.  As an employee advance, Tom regularly pays their rent deposits, rent, and furniture expenses.  He regularly buys his employees lunch.  *Id.*  Ms. Nordyke explains what would happen to the business without Tom:

> If he were away for an extended period of time, I'm certain the business would collapse. This would mean the loss of a job for somewhere around 7 to 10 employees, not to mention the loss of work for many sub-contractors that work for them.

Exh. 1, p. 25.

Tom's generosity and conscientiousness extends beyond business to the community. David Winney met Tom in connection with school-board elections.  Exh. 1, p. 26. Tom, he says, has a "gregarious and cool, calm demeanor." *Id.*  David has witnessed "many times where [Tom] has stepped up to help people, introduce someone to others who might help them in a given situation." *Id.*  For example, David recalls the time Tom gave "an entire day . . . to organize and facilitate an education day" through a church in the community.  *Id.* Tom "uses his time and

---

[2] The Court will notice that many of the letters reference an application to the U.S. Air Force Academy in Colorado Springs.  Hamner had applied to that service academy in 2019.

resources to bring good people together . . . in the Colorado Springs community and in the state

of Colorado." *Id.*

> Steffany sums up the fallout from Tom's arrest:
>
> For our daughter, struggling every day with feeling hopeless, alone, and abandoned. More hospital stays, more running away, more suicide attempts, new medications, new therapists . . . new schools.  L.C. is on her 4th therapist now, and has still not been able to open up to them about her trauma.  .  . The moment that Tom was ripped from her life, she fully understood just how close the bond that they share is. . .
>
> Did Tom know that our franchise business would nearly crash and burn without him, only a month after his arrest? That I would need to get a $30,000 gift from his [now deceased] dad back in December of last year just to keep our doors open for the business? Did he know that our business sales would be half of what they were a year ago when we had Tom out here to handle what only he has the expertise to do?
>
> I'm having to do the job of 5 or 6 people myself which is very difficult to do considering I am a single mom of all these kids. . . .

Exh. 1, p. 1.

### B.      The indictment, § 231(a)(3) conviction, PSR, and Guidelines calculation

On November 19, 2021, Hamner was indicted on six counts.  ECF No. 6.  Count One

charged under 18 U.S.C. § 111(a) and (b) that, on January 6, 2021, Hamner "did forcibly assault,

resist, oppose, impede, intimidate and interfere with an officer and employee of the United States

. . . while [he] [was] engaged in and on account of the performance of official duties and where

the acts in violation of this section involve the intent to commit another felony." *Id.*, pp. 1-2.

Count Two charged under 18 U.S.C. § 231(a)(3) that, on the same day, at or around 1:40 p.m.,

Hamner "obstruct[ed], imped[ed], and interfere[d] with a law enforcement officer lawfully

engaged in the lawful performance of his official duties, incident to and during the commission

of a civil disorder which in any way and degree obstructed, delayed and adversely affected

commerce. . ." *Id.*, p. 2.

4

Counts One and Two rest on the same alleged factual conduct.  The government described it as follows:

> At approximately 1:40 p.m., as officers continued to fend off repeated attempts by rioters to breach the police line and assault the officers, the rioters moved a large metal "TRUMP" billboard on wheels with a metal frame towards the barricade.  As the billboard was moved closer to the police line, Hamner grabbed it and assisted in throwing the large billboard onto the defensive line of police officers, using the billboard as a battering ram against the police officers who were attempting to hold the line.

ECF No. 19, p. 8.

In response, Hamner noted that he was not a part of the group responsible for moving the sign up to the point of the police line.  ECF No. 20, p. 2.  Hamner lifted up his hands and guided a corner of the billboard just as it crossed the line.  *Id.*  Hamner objected to the characterization of "throwing" the sign, as the object was too large for any person to throw.  He also noted that, according to the government, no officer was injured in this episode and that the government's description omitted that the sign passed directly into the hands of officers who placed it on the ground within seconds.  *Id.*

On June 16, 2022, Hamner entered a guilty plea to the Count Two offense under § 231(a)(3).

On August 3, the Probation Office produced a draft PSR.  It correctly determined that the base offense level for Hamner's § 231(a)(3) conviction is found at U.S.S.G. §2A2.4 ("Obstructing or impeding officers").  Draft PSR, ¶ 26.  The Draft PSR then added three levels pursuant to the specific offense characteristic under U.S.S.G. §2A2.4(b)(1) because the sign was a "dangerous weapon" that Hamner "possessed and its use was threatened." *Id.* ¶ 27.  Placing Hamner in criminal history category V, the PSR calculated his Guidelines range at 30 to 37 months.  *Id.* ¶ 90.

5

On August 16, the government and Hamner filed objections to the Draft PSR.  Both the government and Hamner noted that the defendant should receive a two-level adjustment for acceptance of responsibility for pleading guilty to Count Two under U.S.S.G. § 3E1.1.  Both also noted that Hamner falls under criminal history category IV, not V.  Specifically, the government observed that:

> In paragraph 41 of the PSIR, the defendant is assessed 3 points for his 2003 conviction for marijuana cultivation, possession of controlled substance paraphernalia and illegal possession of explosives. However, upon information and belief, that conviction was set aside on March 3, 2021 pursuant to California Health and Safety Code 11361.8, allowing for resentencing or dismissal under California's Control, Regulate and Tax Adult Use of Marijuana Act. Accordingly, under U.S.S.G. § 4A1.2(j), that conviction is not scored.
>
> In paragraph 45 of the PSIR, three points are scored for the defendant's 2010 conviction for inflicting corporal injury on a spouse for which he was originally sentenced to 240 days jail and 36 months' probation. Pursuant to U.S.S.G. § 4A1.1(b), two points should be assessed; not three. The defendant subsequently violated probation and was a probation absconder with an active arrest warrant for over 10 years. The warrant was only resolved after his arrest on the instant offense, which resulted in the defendant being sentenced to an additional month in jail, for a total sentence of 9 months jail, scoring the same two points. See U.S.S.G. § 4A1.2(k). Because the defendant was a probation absconder on January 6, 2021, he was under a criminal justice sentence on that date and accordingly, he receives another 2 points, pursuant to U.S.S.G. § 4A1.1(d).

4/16/22 Gov't Ltr., pp. 3-4.

Hamner objected that the three-level enhancement under U.S.S.G. §2A2.4(b)(1) did not apply because he did not make physical contact with an officer and the sign could not constitute a "dangerous weapon" because Hamner specifically did not intend to "threaten[]" officers with it.  Thus, in criminal history category IV, and with a total offense level of 8 (without §2A2.4(b)(1)) or 11 (with §2A2.4(b)(1)), Hamner's Guidelines range should have been 10-16 months or 18-24 months.

The government objected that Hamner's § 231(a)(3) conviction should have been scored under U.S.S.G. §2A2.2, the section for "Aggravated assault." It contended that although it is

6

correct to begin the analysis under §2A2.4, the cross-reference in §2A2.4(c)(1) should apply

such that the base offense level would be calculated under §2A2.2.   That is wrong for several

reasons.

First, the aggravated assault guideline does not apply because the government has

adduced no evidence of assault, much less aggravated assault. To establish federal generic

assault, the government must prove (1) "a willful attempt to inflict injury upon the person of

another," or (2) "a threat to inflict injury upon the person of another which, when coupled with

an apparent present ability, causes a reasonable apprehension of immediate bodily harm." *United

States v. Dat Quoc Do*, 994 F.3d 1096, 1099 (9th Cir. 2021).   Here, Hamner pled guilty to

"obstruct[ing], imped[ing], [and] interfere[ing] with" a law enforcement officer during a civil

disorder. § 231(a)(3).   He fully accepts responsibility for that offense and deeply regrets his

misconduct.   However, none of those § 231(a)(3) elements implies that he willfully attempted to

inflict bodily injury on an officer.   He did not.   Similarly, a "threat to inflict injury upon the

person of another" must be intentionally made by the defendant. That is, if the defendant

intended his acts to interfere with a person but not threaten them with bodily injury, he is not

guilty of assault. *United States v. Orozco-Santillan*, 903 F.2d 1262, 1265 (9th Cir. 1990); *see

also United States v. Roberts,* 915 F.2d 889, 890 (4th Cir. 1990), *cert. denied*, 498 U.S. 1122,

111 S. Ct. 1079, 112 L. Ed. 2d 1184 (1991).   Again, here Hamner has pled guilty to intentionally

interfering with law enforcement.   No evidence shows his acts were undertaken with the specific

intent to threaten officers with bodily injury, a crime of graver magnitude.

Second, even if the government had established that Hamner's conduct constituted a

basic assault, U.S.S.G. §2A2.2 would not apply because it has not shown an "*aggravated

assault.*" Even if the sign were a "dangerous weapon," the government has not proven that

Hamner had the intent to "cause bodily injury" with it, U.S.S.G. §2A2.2 cmt. n.1, as opposed to using it to "obstruct, impede, [and] interfere with" law enforcement. § 231(a)(3).

Nor has the government demonstrated that Hamner's § 231(a)(3) offense involved "an intent to commit another felony." U.S.S.G. §2A2.2 cmt. n.1. The government contends that "another felony" here is a felony offense under § 111(a)(1).  But an offense under § 111(a)(1) is a felony only "where such acts involve physical contact with the victim of [the] assault." § 111(a)(1).  Hamner did not make physical contact with any victim. The government shows no evidence to the contrary. Nor did Hamner "throw" the sign at officers by adding his weight to one corner of the sign as it passed into the hands of law enforcement.  In addition, a § 111(a)(1) offense requires the government to prove the intentional use of force. *United States v. Arrington*, 309 F.3d 40, 47 (D.C. Cir. 2002). Here, the government has not shown how Hamner intentionally used force against officers.

Third, even if Hamner somehow made "physical contact" with an officer without making physical contact, the § 111(a)(1) offense is not "another felony" and thus U.S.S.G. §2A2.2 is not satisfied. The factual basis for Hamner's § 231(a)(3) offense is identical to the factual basis allegedly supporting a § 111(a)(1) offense. The government has not pointed to any legal element that separates the two offenses. Thus, the § 111(a)(1) offense is not "another felony."  The cases cited by the government itself show that when a defendant is charged with felony assault and his conduct also involved Crime X, Crime X is "another felony" when it constitutes a conceptually distinct crime, such as robbery or possession of a controlled substance. *United States v. Thompson*, 60 F.3d 514, 518 (8th Cir. 1995) (upholding finding that defendant committed aggravated assault where defendant was convicted under Section 111 and his conduct involved the intent to commit state law robbery, where the state law robbery charge was later dismissed);

8

*United States v. Rue*, 988 F.2d 94, 97(10th Cir. 1993) (upholding finding that defendant committed aggravated assault where defendant was convicted under Section 111 and his conduct involved the intent to commit possession of a syringe and a controlled substance, where the defendant was charged with but not convicted of the latter offenses); *United States v. Robles*, 557 F. App'x 355, 359 (5th Cir. 2014) (upholding finding that defendant committed aggravated assault where defendant was convicted under Section 111 and his conduct involved the intent to commit the uncharged state law felony of evading arrest while using a vehicle); *United States v. Ranaldson*, 386 F. App'x 419, 429 (4th Cir. 2010) (upholding finding that defendant committed aggravated assault where defendant was convicted under Section 111 and his conduct involved the intent to commit the uncharged state law felony of intentionally attempting to disarm a law enforcement officer).

Indeed, the government's construction of the cross-reference in §2A2.4(c)(1) would make surplusage of the three-level enhancement in §2A2.4(b)(1).  It claims that the cross-reference is triggered, and the aggravated assault guideline in §2A2.2 applies, merely because the sign was a "dangerous weapon" whose use was "threatened."  But if that were so, the three-level enhancement under §2A2.4(b)(1), penalizing the same conduct, would never do any work.

In sum, in criminal history category IV, and with a total offense level of 8 (without §2A2.4(b)(1)) or 11 (with §2A2.4(b)(1)), Hamner's Guidelines range should be 10-16 months or 18-24 months.

**Argument**

**I.    Sentencing procedure**

As it knows, the Court has broad discretion to consider nearly every aspect of a particular case, and a particular defendant, in fashioning an appropriate sentence.  *United States v. Booker*,

543 U.S. 220 (2005); *Gall v. United States*, 552 U.S. 38 (2007); *Kimbrough v. United States*, 552 U.S. 85 (2007). Although the Court must first calculate the appropriate sentencing range under the Guidelines, it is not bound by the Guidelines or Guidelines Policy Statements. It may make its own policy judgments, even if different from those in the Guidelines. *Kimbrough*, 552 U.S. at 101.

The Court must merely impose a sentence consistent with the terms of 18 U.S.C. § 3553(a) and § 3661. As the Court knows, the cardinal requirement of § 3553(a) is that the "court shall impose a sentence sufficient, but not greater than necessary to comply with the purposes of [§ 3553(a)]. . ." § 3553(a).

## II.     The § 3553(a) factors favor a downward variance

### A.     The nature and circumstances of the offense and the history and characteristics of the defendant (§ 3553(a)(1))

A number of considerations under § 3553(a)(1) warrant a downward variance[3] in Hamner's case: (1) § 231(a)(3) has typically been used to prosecute extreme acts of violence unlike the criminal conduct here; (2) Hamner's harsh pretrial confinement; (3) his true remorse; and (4) the misfortune that would befall his young children through his extended absence.

#### 1.     The typical § 231(a)(3) prosecution does not look like Hamner's

Before January 6, the government seldom used the civil disorder statute. Start with its unsavory history. Section 231(a)(3) was enacted as part of the Civil Obedience Act of 1968 (COA). Pub. L. 90-284, Apr. 11, 1968, Title X. Senator Russell B. Long of Louisiana sponsored the COA during the Senate's debates over the Civil Rights Act of 1968. 114 Cong.

---

[3] If the Court calculates Hamner's Guidelines range at 10-16 months' incarceration, then it would not need to downwardly vary to impose a 16-month sentence. But if it calculates the range at 18-24 months or higher, Hamner asks the court to downwardly vary to at least 16 months for all the reasons cited herein.

10

Rec. 1294-96 (Jan. 29, 1968).  It was proposed as a rejoinder to the civil rights bill and to the civil rights movement.

The COA was designed to nullify the legal protections proposed under the "hate crime" title of the Civil Rights Act of 1968.  Codified at 18 U.S.C. § 245, that title criminalized interfering with another person because of the person's race or because he engaged in federally protected activity. Senator Long was clear that the COA was designed to diminish the hate crime law. 114 Cong. Rec. 1287-94 (Jan. 29, 1968).  His "greatest immediate concern" about the hate crime law was "the unwitting stumbling block it could place before State and local officials in their honest attempts to detain and prosecute incendiary rabble rousers." *Id.* at 1289.  He noted that "half of the Baton Rouge police force could have been thrown into jail" under the hate crime law for beating and setting attack dogs on peaceful protestors. *Id.*

Section 231 was also designed to jail civil rights leaders.  For example, Senator Long said the COA was needed due to "a so-called civil rights march led by Dr. Martin Luther King in the streets of Birmingham in March of 1963." 114 Cong. Rec. 1294 (Jan. 29, 1968).  During that march, Long complained, Dr. King had "addressed a tense crowd with inflammatory words," while in jail, King "wrote an inflammatory letter which gained wide recognition in its pleas for Negroes to disobey those laws they felt unjust." *Id.*  Long offered similar explanations for the COA by reference to other civil rights leaders. 114 Cong. Rec. 5536 (Mar. 6, 1968). As for the constitutional power Congress needed to pass the COA—the Commerce Clause—Long explained the COA would apply to intrastate conduct so that it would "not leave available to Rap Brown or Stokely Carmichael the technical defense that they did not cross the State boundary with the intent to create a riot." 114 Cong. Rec. 5533.  Section 231 would "strike at" the

"doctrine . . . that one should not obey the laws that stand in the way of alleged 'civil rights.'" 114 Cong. Rec. 1295 (Jan. 29, 1968).

Partly as a result of this history, the Department of Justice had seldom brought § 231(a)(3) prosecutions before January 6.  When it did, the offense conduct usually entailed acts of extreme violence and typically occurred on Native reservations which were sometimes wanting in local law enforcement tools.  *E.g.*, *United States v. Wood*, 2021 U.S. Dist. LEXIS 134774, *2 (D. Del. July 20, 2021) (defendant threw bricks at police); *United States v. Patton*, 2021 U.S. Dist. LEXIS 108479, * 2 (D. Utah June 8, 2021) (defendant set a police car on fire); *United States v. Featherston*, 461 F.2d 1119, 1122 (5th Cir. 1972) (defendants deployed explosives for the "coming revolution"); *United States v. Casper*, 541 F.2d 1275, 1277 (8th Cir. 1976) (defendants shot at law enforcement); *United States v. McArthur*, 419 F. Supp. 186, 192 (D.N.D. 1975) (same); *United States v. Jaramillo*, 380 F. Supp. 1375, 1377 (D. Neb. 1974) (same).

Even most of the government's January 6 prosecutions under § 231(a)(3) involve acts of clearcut violence that entail physical contact.  Consider the following cases:

| § 231(a)(3) 1/6 Defendant | Case No. | Violent criminal conduct |
|---|---|---|
| Adams | 21-cr-84 | Pushed police officers against a wall |
| Alam | 21-cr-190 | Threw punches at law enforcement |
| Antonio | 21-cr-497 | Threw objects at police |
| Ballard | 21-mj-529 | Threw tabletop at police |
| Bingham | 21-mj-430 | Threw punch at officer |
| Brock | 21-mj-527 | Striking police with rod |
| Brockhoff | 21-mj-444 | Shooting fire extinguisher at police |

12

| Brown | 21-mj-565 | Spraying pepper spray in officers' faces |
| Brown | 21-mj-498 | Pushing and punching police |
| Buteau | 21-mj-487 | Throwing hard objects at police |
| Byerly | 21-mj-500 | Tasing police |
| Caldwell | 21-cr-181 | Spraying pepper spray at police |
| Cua | 2021 U.S. Dist. LEXIS 44293 | Shoving officer |
| Coffee | 21-cr-327 | Hitting officer with crutch |
| Copeland | 21-mj-403 | Shoving and grabbing officer |
| Council | 21-mj-08 | Shoving officers |
| Dasilva | 21-mj-520 | Grabbing, pushing and pulling police |
| Davis | 21-mj-536 | Shoving police |
| DeGrave | 2021 U.S. Dist. LEXIS 92102 | "Coming to blows" with police |
| Egtvedt | 21-cr-177 | Throwing punches at police |
| Fairlamb | 21-cr-120 | Shoving and punching police |
| Fitzsimons | 21-cr-158 | Punching officers |
| Foy | 2021 U.S. Dist. LEXIS 123953 | Swinging hockey stick and throwing objects at police |
| Galetto | 21-mj-386 | Knocking officer to the ground |
| Hayah | 21-mj-577 | Shoving officers |
| Jenkins | 21-cr-245 | Throwing pole at officers |
| Johnson | 21-cr-332 | Knocking over officer who falls unconscious |
| Judd | 21-cr-40 | Throwing object on fire at police |
| Klein | 21-cr-236 | Striking officers with shield |
| Lang | 21-cr-53 | Thrusting a bat and shield at officers |

13

| | | |
|---|---|---|
| Languerand | 21-cr-353 | Throwing garbage cans at officers |
| Lazar | 21-mj-533 | Spraying chemicals at police |
| Mackrell | 21-cr-276 | Striking multiple officers |
| McCaughey III | 21-cr-40 | Striking multiple officers |
| McGrew | 21-cr-398 | Striking officer |
| McHugh | 21-cr-453 | Macing officers |
| McKellop | 21-cr-268 | Macing officers |
| Mellis | 21-cr-206 | Striking officers with a stick |
| Middleton | 21-cr-367 | Poking officers in the face |
| Miller | 21-cr-75 | Spraying officers with pepper spray |
| Morss | 21-cr-40 | Striking officer with shield |
| Mullins | 21-cr-35 | Assaulting officer |
| Nichols | 21-cr-117 | Spraying pepper spray at officers |
| Owens | 21-cr-286 | Striking officer in the head with skateboard |
| Padilla | 21-cr-214 | Ramming cop with metal sign |
| Palmer | 21-cr-328 | Spraying fire extinguisher in face of officer |
| Pezzola | 21-cr-52 | Smashing large window of Congress, a crime of violence |
| Quaglin | 21-cr-40 | Striking multiple officers |
| Randolph | 21-cr-332 | Assaulting officer |
| Sabol | 21-cr-35 | Striking officer |
| Sandlin | 21-cr-88 | Attempting to rip helmet off officer |
| Sandford | 21-cr-86 | Throws fire extinguisher at officers |
| Sargent | 21-cr-258 | Throwing punches at officers |

| Schwartz | 21-cr-178 | Bear spraying officers |
|---|---|---|
| Shively | 21-cr-151 | Assaulting officers |
| Sibick | 21-cr-291 | Attempting to take officer's gun, while threatening to kill him |
| Stager | 21-cr-35 | Smashing officer with flag pole |
| Stevens | 21-cr-40 | Striking officer with shield |
| Warnagris | 21-cr-382 | Shoving officer |
| Webster | 21-cr-208 | Striking officer with flag pole |
| Woods | 21-cr-476 | Tripping officer and pushing her to ground |

Hamner's conduct unquestionably interfered with law enforcement, was certainly reckless, and requires punishment. But in one fundamental sense, the act of lending his weight to a corner of a heavy sign moments before it passed into the hands of officers is not akin to shooting at officers, throwing bricks at them, punching them or striking them with poles. In all the latter cases, the criminal acts admit of no intent except to inflict bodily injury. A sentient human cannot throw a brick at or shoot a person without intending to physically harm him or her. Hamner's acts here were more equivocal. Given that the sign had been visibly lumbering towards law enforcement for a minute or longer, one cannot simply presume Hamner intended to physically injure the officers—as opposed to interfering with them—by participating at the last moment in the sign's shift from the protesters' hands to the officers.' This is a significant difference in criminal intent. Whereas shoving, punching and kicking a person is quintessential assaultive conduct, the government has apparently never brought assault-like charges for recklessly crowd surfing a dangerously heavy sign. This is a mitigating factor.

### 2.      Hamner's harsh pretrial confinement

A defendant's harsh pretrial confinement is a basis for a downward variance (and even a departure).  *United States v. Jayyousi*, 657 F.3d 1085, 1118 (11th Cir. 2011) (a court "may reduce a sentence to account for the harsh conditions of pretrial confinement"); *United States v. Carty*, 264 F.3d 191, 196 (2d Cir. 2001) (same); *Bains v. United States*, 2009 U.S. Dist. LEXIS 2018, at *8 (D.N.J. Jan. 12, 2009) (poor conditions of pretrial condition "properly treated as grounds for a variance").

Hamner was arrested and detained on November 9, 2021.  Initially held at a jail in Douglas County, Colorado, Hamner was kept in isolation in his cell 23 hours a day for nearly two months.  He was then transferred to Central Virginia Regional Jail, in Orange, Virginia. That did not improve matters.  Members of the Crips gang determined that Hamner was a January 6 defendant.  They put a bounty on his head in the jail, offering to pay any inmate who kills him.  As a result, Hamner was again moved to almost total isolation, this time for approximately two weeks.   It is well established in the relevant social science literature that "prisoners subjected to prolonged isolation may experience depression, despair, anxiety, rage, claustrophobia, hallucinations, problems with impulse control, and/or an impaired ability to think, concentrate or remember.  Some inmates subjected to solitary confinement develop clinical systems usually associated with psychosis or severe affective disorders." *US: Look Critically at Widespread Use of Solitary Confinement*, Human Rights Watch, June 18, 2012, available at: https://www.hrw.org/news/2012/06/18/us-look-critically-widespread-use-solitary-confinement.   Of course, those are the pressures before one considers the added psychological torment of being hunted by a criminal gang in jail.

Counsel has never seen an inmate encounter such trouble in securing his Sixth Amendment right to counsel.  For the Central Virginia Regional Jail does not even have an attorney-client line for inmates.  Instead, if inmates wish to confer with counsel, the latter are required to download an online communication platform and pay nearly $50 for every 20 minutes of conversation with the inmate.  Because the calls must often be booked weeks in advance, inmates lack the ability to communicate in real time with their lawyers in sync with case developments.

Hamner's nine months of hard time are a reason for a downward variance.

### 3.      Hamner's remorse

A defendant's true remorse, whether exceptional or not, is a valid basis for a downward variance.  And district courts may vary downward based on remorse without regard to whether the acceptance of responsibility adjustment under U.S.S.G. §3E1.1 has already been applied. *E.g.*, *United States v. Howe*, 543 Fed. 3d 128, 138 (3d Cir. 2008).

As explained above, Hamner deeply regrets his decision to interfere with law enforcement during the riot.  To the extent his actions contributed to the distress of outnumbered law enforcement officers, he offers them his sincere apology.  Hamner would seize an opportunity to offer assistance to injured officers and to contribute to the repair of physical damage to the Capitol.  Hamner will personally demonstrate remorse at sentencing in his allocution.

### 4.      The deleterious effects on Hamner's children

While a Guidelines policy statement provides that "family ties and responsibilities are not ordinarily relevant in determining whether a *departure* may be warranted," U.S.S.G. §5H1.6 (emphasis added), it is still proper to downwardly vary on that basis and, in any case, the Court is

17

empowered to disagree with the Guidelines on policy grounds. *E.g.*, *United States v. Munoz-Nava*, 524 F.3d 1137 (10th Cir. 2008) (downwardly varying from 46-57 month guideline range to 12 months in prison and 12 months of home confinement based on defendant's role as a caretaker for eight-year-old son and elderly parents). After *Gall*, the sentencing court does not need to find the defendant's family responsibilities "extraordinary" in order to disregard the policy of U.S.S.G. §5H1.6. *E.g.*, *United States v. Warfield*, 283 Fed. App'x 234, 235 (5th Cir. June 20, 2008). As in every discretionary sentencing decision, the standard is reasonableness.

Hamner is the father to four children between the ages of four and 17 years old. The family accountant has indicated that it is doubtful whether Steffany Hamner can maintain sufficient income to support the family in Hamner's absence. She confirms that reality. Exh. 1, p. 1. Already, one of their teenage daughters has had to seek out psychological counseling due to the mental strain brought on by her father's absence. *Id.* These are powerful mitigating factors that warrant a downward variance.

## B.    Avoiding unwarranted sentence disparities (§ 3553(a)(6))

Section 3553(a) requires courts to fashion a sentence in a way that avoids "unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." § 3553(a)(6).

This Court's own January 6 sentences show that a sentence higher than 16 months' incarceration would create gross unwarranted sentence disparities. Consider the sentence imposed in *United States v. Mark Leffingwell*, 21-cr-5-ABJ (D.D.C. 2021). Unlike Hamner, Leffingwell entered the Capitol Building. *Id.*, ECF No. 31, p. 2. But "Leffingwell was not content to merely stand inside the threshold":

> Positioned at the front of the line of rioters stacked hundreds deep behind him, Leffingwell chanted at the officers standing before him to "join us!" in the rioters' efforts

18

to assault the Capitol.  When some in the crowd shouted for the rest of the crowd to "back up," Leffingwell rebuked them, shouting "If you back up, you'll never get back in!" When U.S. Capitol Police Officers D.A and W.H tried to repel Leffingwell and the gathering crowd, *Leffingwell struck both officers in the head.*

*Id.*, p. 2 (emphasis added).

Specifically, Leffingwell "first punched Officer D.A. in the head, and then as he continued to swing, he punched Officer W.H. in the head, before eventually punching Officer D.A. once more." *Id.*, p. 8.  His conduct was so brazen that he was one of the few protesters arrested on the scene.  *Id.*, p. 9.  Leffingwell pled guilty to a felony offense under § 111(a)(1). *Id.*  The government sought a sentence of 27 months' incarceration.  *Id.*, p. 2.

The Court imposed a sentence of ***six months' incarceration*** with credit for time served, followed by 24 months of supervised release.  Sentencing Hamner to higher than 16 months' incarceration with credit for time served would create a gross unwarranted disparity with respect to *Leffingwell*.  Unlike Leffingwell, Hamner did not enter the Capitol Building.  Unlike Leffingwell, he did not encourage other protesters to enter the building.  Above all, when Leffingwell *punched two officers in the head multiple times*, that act cannot admit of any intent except to inflict bodily injury on the officers.  By contrast, while Hamner's role in the sign incident was reckless and deplorable, one cannot assume from the act alone that he intended to inflict bodily injury on officers who were not in fact injured.  Even if Leffingwell had other mitigating factors that Hamner lacks, to give Hamner a sentence over three times higher than Leffingwell's would create manifest unwarranted disparity.

Consider *United States v. Mostofsky*, 21-cr-138-JEB (D.D.C. 2021).  Mostofsky participated in a scrum of protesters pushing on a barricade held in place by police officers; entered the Capitol Building; and then stole a police vest and shield.  He pled guilty to civil disorder under § 231(a)(3), misdemeanor theft of government property, and entering into a

19

restricted area.  He was sentenced to ***eight months' incarceration***.[4]  Unlike Mostofsky, Hamner did not enter the Capitol and did not steal.  Hamner's brief role in carrying the sign is not unlike Mostofsky's brief act of pushing on a police barricade.  Sentencing Hamner to more than double Mostofsky's sentence would create an unwarranted disparity.

Consider *United States v. David Blair*, 21-cr-186-CRC (D.D.C. 2021).  Carrying a Confederate flag, Blair walked up to a police line outside the Capitol.  He turned towards an officer and said, "What's up motherfucker, what's up, what's up bitch?" 21-cr-186, ECF No. 55, p. 8.  When the officer came close to Blair, the defendant jabbed him with a lacrosse stick.  *Id.*  A search incident to arrest recovered a knife in the defendant's backpack.



21-cr-186, ECF No. 55, p. 8.

Blair pled guilty to a § 231(a)(3) offense.  This defendant was sentenced to ***five months' incarceration***.  Just as in *Leffingwell*, Blair's acts could only be interpreted as intended to inflict

---

[4] Although Mostofsky's convictions were nonviolent, the Bureau of Prisons placed a public safety factor on him, apparently solely because he was a January 6 defendant.  Thus, he was denied placement at a low-security camp.  Right after being transferred to FCI Danbury, Mostofsky was violently assaulted in prison.  He has been held in 24/7 isolation for the past 45 days.

bodily injury or to threaten it.  Thus, to sentence Hamner over three times higher than Blair would create unwarranted sentence disparity.

Consider *United States v. Nolan Cooke*, 22-cr-52-RCL (D.D.C. 2021).  Cooke pled guilty to a § 231(a)(3) offense.  He "helped lead the charge of rioters who broke through the police line guarding the east side of the Capitol building during the electoral vote certification. Cooke later bragged that he was one of the first to break through the barricade. Cooke and other rioters struggled with police officers who were protecting the restricted area. Cooke pushed against the bicycle rack barrier manned by police officers and encouraged other rioters to break through the police line, yelling obscenities along the way." 22-cr-52, ECF No. 52, p. 2.  But he wasn't done there.  Cooke used a flagpole carrying an American flag to strike one of the Capitol windows and encouraged other rioters to "smash the windows" and "break the glass."  *Id.*

Cooke was sentenced to ***a year and a day of incarceration***.  Unlike Cooke, Hamner did not break through barricades or encourage others to do so.  Unlike Cooke, Hamner did not destroy government property and encourage others to do the same.  To impose a higher sentence on Hamner would create an unwarranted sentence disparity.

Consider *United States v. Moises Romero*, 21-cr-677-TSC (D.D.C. 2021).  Romero pled guilty to a § 231(a)(3) offense.  He "entered the restricted Capitol Grounds and took videos of rioters assaulting officers with poles and a fire extinguisher in the West Plaza.  He joined a group of rioters that pushed past police to occupy bleachers set up for the inauguration, and later led a group that forcibly pushed through a makeshift police barricade at the Senate Wing Door to gain entrance to the Capitol, grabbing the edge of an officer's riot shield in the process.  After spending about 15 minutes celebrating, taking videos, and entering Senator Merkley's office, Romero left the building, only to return to the east side of the Capitol, joining yet another group

of rioters trying to gain entrance to the Capitol through the Rotunda Doors. The next day, Romero posted a video on social media, proudly displaying himself inside and around the Capitol Building." 21-cr-677, ECF No. 29, p. 2.  Romero was sentenced to *a year and a day of incarceration.*  Imposing a sentence higher than 16 months' incarceration on Hamner would create an unwarranted disparity because unlike Romero he did not engage in repeat behavior and did not enter the Capitol Building.

A sentence higher than 16 months would create another type of unwarranted disparity. Dozens of defendants who entered the Capitol Building have received sentences of probation. Although Hamner's conduct involved risk to the safety of officers, the probationary defendants engaged in conduct that was in many respects more serious than Hamner's:

| 1/6 Def. & Case No. | Charge | Sentence | Offense Conduct |
|---|---|---|---|
| Josh & Jessica Bustle, 21cr238 | Parading in Capitol | 24 mos. probation and 24 mos. supervised release | Entered Capitol Building, remained for 20 minutes. Posted on Facebook, "Pence is a traitor. We stormed the capital (sic). . . We need a revolution!" |
| Bryan Ivey, 21cr267 | Parading in Capitol | 36 mos. probation | Entered Capitol Building through a breached window, waving additional rioters into the building, spending 30 minutes inside. |
| Valerie Ehrke, 21cr97 | Parading in Capitol | 36 mos. probation | Entered Capitol Building. |
| Andrew Bennett, 21cr227 | Parading in Capitol | 3 mos. home confinement, 24 mos. probation | Entered the Capitol Building, livestreaming the event on his Facebook page for over an hour. |

22

| Lori, Thomas Vinson, 21cr355 | Parading in Capitol | 5 years probation, 120 hours of community service | Entered the Capitol Building, later telling news outlet that her actions were "justified" and that she would "do this all over again." |
|---|---|---|---|
| Jordan Stotts, 21cr272 | Parading in Capitol | 24 mos. probation | Entered the Capitol Building, remained inside for an hour, celebrating with others and taking videos with his cell phone. |
| Glen Croy, 21cr162 | Parading in the Capitol | 36 mos. probation | Entered the Capitol Building. Chief Judge suggested at plea hearing that parading offense is not conceptually different from government's obstruction of justice charge under § 1512(c)(2) |
| Douglas Sweet, Cindy Fitchett, 21cr41 | Parading in the Capitol | 36 mos. probation | Entered the Capitol Building, Fitchett filming herself saying, "We are storming the Capitol. We have broken in." |
| Eric Torrens, 21cr204 | Parading in the Capitol | 36 mos. probation | Entered the Capitol Building, taking celebratory pictures in the Crypt. |
| Rasha Abdual-Ragheb, 21cr42 | Parading in the Capitol | 36 mos. probation | Entered the Capitol Building, desiring to demonstrate against Congress. |
| Jonathan Sanders, 21cr384 | Parading in the Capitol | 36 mos. probation, 60 hours community service | Entered the Capitol Building, intending to protest presidential election |
| Michael Orangias, 21cr265 | Parading in the Capitol | 36 mos. probation | Entered the Capitol Building, taking pictures inside. |

| | | | |
|---|---|---|---|
| John Wilkerson, 21cr302 | Parading in the Capitol | 36 mos. probation, 60 hours of community service | Entered the Capitol Building, posting on social media, "today was a good day, we got inside the Capitol." |
| Brandon Nelson, 21cr344 | Parading in the Capitol | 24 mos. probation | Entered the Capitol Building, co-defendant texting, "We stormed the Capitol and shut it down. Currently still inside" and "Patriots won't go down without a fight." |
| Andrew Wrigley, 21cr42 | Parading in the Capitol | 18 mos. probation | Entered the Capitol Building, taking pictures of himself inside |
| Jacob Hiles, 21cr155 | Parading in the Capitol | 24 mos. probation | Entered the Capitol Building, taking pictures showing him smoking "an unknown substance" inside. |
| Bruce Harrison, 21cr365 | Parading in the Capitol | 24 mos. probation | Entered the Capitol Building, taking pictures of himself inside. |
| Terry Brown, 21cr41 | Parading in the Capitol | 36 mos. probation | Entered the Capitol Building, disobeyed police order to leave. |
| Felipe Marquez, 21cr136 | Disorderly conduct in the Capitol | 18 mos. probation | Entered the "hideaway" office of Senator Merkley, saying, "We only broke a couple windows." |
| Michael Rusyn, 21cr303 | Parading in the Capitol | 24 mos. probation | Among the first to enter the Capitol through a certain door, part of a group of people who shouted, "Tell Pelosi we're coming for that b****," called police |

24

| | | | |
|---|---|---|---|
| | | | traitors, and shouted "Stop the steal." |
| Andrew Hatley, 21cr98 | Parading in the Capitol | 36 mos. probation | Entered the Capitol Building, taking pictures with various historical statues. |
| Nicholas Reimler, 21cr239 | Parading in the Capitol | 36 mos. probation | Entered the Capitol Building, taking pictures of himself and friends. |
| Caleb Jones, 21cr321 | Parading in the Capitol | 2 mos. home confinement, 24 mos. probation | Entered the Capitol Building, "walking down numerous hallways and into the Capitol Rotunda." |
| Anthony R. Mariotto, 21cr94 | Parading in the Capitol | 36 mos. probation | Entered the Capitol Building, posting on Facebook, "This is our house" under selfie photograph. |
| Michael Stepakoff, 21cr96 | Parading in the Capitol | 12 mos. probation | Entered the Capitol Building, posting on social media after, "The Capitol is OUR house, not theirs." |
| Tanner Sells, 21cr549 | Parading in the Capitol | 24 mos. probation | Entered the Capitol Building. |
| Gary Edwards, 21cr366 | Parading in the Capitol | 12 mos. probation | Entered the Capitol Building, including Senate office S140. |
| Zachary, Kelsey Wilson, 21cr578 | Parading in the Capitol | 24 mos. probation | Entered the Capitol Building, penetrating all the way to the Speaker's personal office |
| Jennifer Parks, Esther Schwemmer, 21cr363 | Parading in the Capitol | 24 mos. probation | Entered the Capitol Building, taking pictures inside |
| Jackson Kostolsky, 21cr197 | Parading in the Capitol | 36 mos. probation | Entered the Capitol Building |
| Eduardo Gonzalez, 21cr115 | Parading in the Capitol | 24 mos. probation | Entered the Capitol, smoking marijuana inside "multiple times." |
| Israel Tutrow, 21cr310 | Parading in Capitol | 36 mos. probation | Entered the Capitol Building with a knife |

25

In sum, a sentence higher than 16 months' incarceration with credit for time served would create many unwarranted sentence disparities.

## C.    The seriousness of the offense and deterrence (§ 3553(a)(2))

The Court must consider "the need for the sentence imposed . . . to reflect the seriousness of the offense" and to "afford adequate deterrence to criminal conduct" and to "protect the public from further crimes of the defendant." § 3553(a)(2).

The penalties Hamner has already incurred as a result of this case are more than sufficient to deter him from ever again interfering with police. As indicated above, he has served hard time in pretrial incarceration since November 2021. His life has been threatened in jail. His family is struggling to make ends meet. And he now has a felony conviction in his record.

These developments are serious penalties for a crime that occurred in the blink of an eye and serve as potent specific and general deterrence. The shame Hamner has experienced is itself a guarantee of deterrence. *See*, *e.g.*, *United States v. Polizzi*, 549 F. Supp. 2d 308, 449 (E.D.N.Y. 2008) (specific deterrence satisfied by "intense shame created by the convictions); *United States v. Maynard*, 2020 U.S. Dist. LEXIS 179542, at *5 (E.D.N.Y. Dec. 17, 2012) (Weinstein, J.) (same).

## Conclusion

For all the foregoing reasons, Hamner respectfully requests a sentence no greater than 16 months' incarceration with credit for time served.

Dated: August 31, 2022                    Respectfully submitted,

                                          */s/ Nicholas D. Smith*
                                          Nicholas D. Smith (D.C. Bar No. 1029802)
                                          1123 Broadway
                                          Suite 909
                                          New York, NY 10010

26

Phone: (917) 902-3869
nds@davidbsmithpllc.com

*Attorney for Thomas Hamner*

### Certificate of Service

I hereby certify that on the 31st day of August, 2022, I filed the foregoing submission with the Clerk of Court using the CM/ECF system, which will send a notification of such filing (NEF) to the following CM/ECF user(s):

> Douglas Collyer
> Assistant United States Attorney
> 555 4th Street, N.W.
> Washington, D.C. 20530

And I hereby certify that I have mailed the document by United States mail, first class postage prepaid, to the following non-CM/ECF participant(s), addressed as follows: [none].

*/s/ Nicholas D. Smith*
Nicholas D. Smith (D.C. Bar No. 1029802)
1123 Broadway
Suite 909
New York, NY 10010
Phone: (917) 902-3869
nds@davidbsmithpllc.com

*Attorney for Thomas Hamner*