**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 21-cr-689-ABJ** |
| **THOMAS PATRICK HAMNER,** | |
| **Defendant.** | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Thomas Patrick Hamner to 60 months' incarceration, which is the guideline imprisonment recommendation under operation of U.S.S.G. § 5G1.2 and 18 U.S.C. § 231's statutory maximum, three years of supervised release, $2,000 in restitution, and the mandatory $100 special assessment for his violation of 18 U.S.C. § 231(a)(3), obstructing, impeding, or interfering with police during a civil disorder, Count Two of the Indictment, to which he pleaded guilty without a plea agreement. A charge of assaulting, resisting or impeding police, in violation of 18 U.S.C. §§ 111(a)(1) and (b), three misdemeanor charges, and a second charge of violating § 231(a)(3), remain pending.

### I.    INTRODUCTION

Defendant Thomas Patrick Hamner, a self-employed business owner from Colorado with multiple prior felony convictions, violently participated in the January 6, 2021 attack on the United States Capitol building that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured

1

more than one hundred police officers, including members of the United States Capitol Police ("USCP") and the Metropolitan Police Department ("MPD"), and resulted in more than 2.7 million dollars' in losses.[1] Hamner directly contributed to the violence unleashed on January 6, 2021 by, *inter alia*, hurling, along with other rioters, a large, heavy, steel-framed billboard, approximately ten feet high by ten feet long, against a line of police officers who were defending the Capitol on January 6.

Hamner was one of the first rioters to breach the perimeter fencing around the Capitol on January 6.   After watching other rioters repeatedly assaulting police officers on the West Plaza of the Capitol – a scene that horrified people around the world – Hamner chose to join in by wrestling away barricades erected to keep a violent and hostile mob from entering, and then helping to ram a large billboard directly onto officers on the West Plaza.

The government recommends that the Court sentence Hamner to 60 months' incarceration, which is the advisory Guidelines' recommendation that applies to his conviction on Count Two, as shown herein.   A 60-month custodial sentence on Count Two is sufficient but not greater than necessary to meet the requirements of 18 U.S.C. § 3553(a), particularly considering the violence of his crimes and his criminal history.

## II.      FACTUAL BACKGROUND

### A.       The January 6, 2021 Attack on the Capitol

On January 6, 2021, hundreds of rioters, unlawfully broke into the U.S. Capitol Building in an effort to disrupt the peaceful transfer of power after the November 3, 2020 presidential

---

[1] As of April 5, 2022, the approximate losses suffered as a result of the siege at the United States Capitol was $2,734,783.15.  That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police.

election. Many rioters attacked and injured police officers, sometimes with dangerous weapons; they terrified congressional staff and others on scene that day, many of whom fled for their safety; and they ransacked this historic building—vandalizing, damaging, and stealing artwork, furniture, and other property. Although the facts and circumstances surrounding the actions of each rioter who breached the U.S. Capitol and its grounds differ, each rioter's actions were illegal and contributed, directly or indirectly, to the violence and destruction that day.

As set forth in the Pre-Sentence Report ("PSR") (ECF 26) and the Statement of Offense incorporated into Hamner's plea agreement, a joint session of Congress had convened at approximately 1:00 p.m. at the U.S. Capitol. Members of the House of Representatives and the Senate were meeting in separate chambers to certify the vote count of the Electoral College of the November 3, 2020 Presidential election. By approximately 1:30 p.m., the House and Senate adjourned to separate chambers to resolve a particular objection. Vice President Mike Pence was present and presiding, first in the joint session, and then in the Senate chamber.

As the proceedings continued, a large crowd gathered outside the U.S. Capitol. Temporary and permanent barricades were in place around the exterior of the building, and U.S. Capitol Police were present and attempting to keep the crowd away from the building and the proceedings underway inside. At approximately 2:00 p.m., certain individuals forced their way over the barricades and past the officers, and the crowd advanced to the exterior of the building. Members of the crowd did not submit to standard security screenings or weapons checks by security officials.

The vote certification proceedings were still underway, and the exterior doors and windows of the U.S. Capitol were locked or otherwise secured. Members of the U.S. Capitol Police attempted to keep the crowd from entering; however, shortly after 2:00 p.m., individuals in the

3

crowd forced their way in, breaking windows and assaulting police officers along the way, while others in the crowd cheered them on.

At approximately 2:20 p.m., members of the House of Representatives and the Senate, including the President of the Senate, Vice President Pence, were forced to evacuate the chambers. All proceedings, including the joint session, were effectively suspended. The proceedings resumed at approximately 8:00 p.m. after the building had been secured. Vice President Pence remained in the United States Capitol from the time he was evacuated from the Senate Chamber until the session resumed. *See* Notice of Information in Preparation for May 17, 2022 Plea Hearing, ECF 19.

### *Attempted Breach of the Capitol Building and Assaultive Conduct on the West Front of the Capitol Grounds*

Assaults against police on the West Front of the Capitol Grounds, as depicted in Government's Exhibit 1, made the rioters' entry into the United States Capitol Building on January 6, 2021, possible. Initiated by the most fervent smaller groups and individuals within the crowd and using the mob itself as a cloak for their actions, each blow helped the crowd penetrate further into the USCP's defenses until the building itself was accessible and the occupants were at risk. The physical breaches of the building can therefore be traced directly back to the assaultive conduct on the grounds of the West Front.



**Exhibit 1[2]**

The outer perimeter of the Capitol Grounds, made up of bicycle-rack style fencing, bore

numerous signs stating, "AREA CLOSED – By order of the United States Capitol Police Board[.]"

These fences were not actively manned, but members of the USCP were stationed nearby as well

as patrolling throughout the grounds.   At approximately 12:45 p.m., a crowd began to gather

against the barricades near the Peace Monument, which led to the Pennsylvania Walkway.    Seeing

this, a half dozen USCP officers began to gather behind what is labeled in Government's Exhibit 1

as "1st Police Barricade," circled in red and marked as Area A.    At 12:52 p.m., the first breach of

the outer perimeter occurred, with several members of the crowd jumping over and pushing down

the unmanned bicycle-rack barricades at the Peace Circle and advancing into the restricted area to

---

[2] Open-Source Rendering of Capitol Building and Grounds as they appeared on January 6, 2021, credited to Twitter users @ne0ndistraction & @sansastark525.

engage with USCP officers at the first manned barrier.   Less than one minute later, with the crowd already numbering in the hundreds, the handful of USCP police officers in and around the barrier were shoved out of the way by the mob.   By 12:58 p.m., the rioters had crossed the unmanned barrier halfway down the Pennsylvania Walkway and overwhelmed the second manned police barrier, Area B on Government's Exhibit 1.   They flooded the area labeled "Lower West Plaza," Area C on Government's Exhibit 1, pushing against the barricade there.

Despite the more-permanent nature of the metal fencing at the West Plaza barricade and the growing number of USCP officers responding to the area, the crowd remained at this location for less than a minute, pushing through and over the fence to the front of the plaza.   For the next hour and a half, a growing number of police officers were faced with an even faster growing number of rioters in the restricted area, the two sides fighting over the establishment and reinforcement of a police defensive line on the plaza with fists, batons, makeshift projectiles, pepper spray, pepper balls, concussion grenades, smoke bombs, and a wide assortment of weaponry brought by members of the crowd or seized from the inaugural stage construction site, as depicted in Government's Exhibits 2A-D and 3A-D.



**Exhibit 2A**                                              **Exhibit 2B**



Exhibit 2C                                   Exhibit 2D[3]



Exhibit 3A                                   Exhibit 3B

Exhibit 3C                                   Exhibit 3D[4]

---

[3] Exhibits 2A-D are stills from USCP security footage showing the progression of the crowd from the outer barricades (2A), to the first manned police barricade (2B), to engaging with USCP at the second manned police barricade (2C), and beginning to fill the Lower West Plaza (2D).

[4] Exhibits 3A-D are stills from USCP security footage showing the breach of the West Plaza.   The breach of the barricades (3A) was followed by the formation of a USCP officer wall (3B) until MPD officers arrived with bike rack barriers for a defensive line at the top of the West Plaza stairs (3C).   In the photo of the nearly completed bicycle rack barrier line as of 1:39 p.m., a large Trump

Following the conclusion of President Trump's speech at approximately 1:15 p.m., the crowd began to grow even more rapidly, supplemented by those who had walked the mile and a half from the Ellipse to the Capitol.   At 2:03 p.m., Metropolitan Police Department officers responding to USCP officers' calls for help began broadcasting a dispersal order to the crowd.   It began with two blaring tones, and then a 30-second announcement, which was played on a continuous loop:

> This area is now a restricted access area pursuant to D.C. Official Code 22-1307(b).
> All people must leave the area immediately.   This order may subject you to arrest
> and may subject you to the use of a riot control agent or impact weapon.

Despite the warning and the deployment of riot control agents and impact weapons, few members of the crowd left.   On the contrary, the mob in the restricted area continued to grow as crowds streamed towards the West Front, which looked like a battle scene, complete with an active melee and visible projectiles.

After having actively defended their line for over an hour, the hundreds of officers at the front of the inauguration stage were flanked, outnumbered, and under continuous assault from the thousands of rioters directly in front of them as well as members of the mob who had climbed up onto scaffolding above and to the side of them, many of whom were hurling projectiles.   Because many of the thousands of people surrounding the officers were not engaged in assaultive conduct, it was difficult for officers to identify individual attackers or defend themselves.   By 2:28 p.m., with their situation untenable and openings in the perimeter having already led to breaches of the building, several large gaps appeared in the police defensive line at the West Front and a general

---

billboard which would later be used by Hamner and others against the police line like a battering ram is visible (3D).

retreat was called.   With their defensive lines extinguished, several police officers were surrounded by the crowd.   The rioters had seized control of the West Plaza and the inauguration stage, as depicted in Government's Exhibits 4A-C.   There were now no manned defenses between the crowd and several entrances into the United States Capitol Building, allowing the stream of rioters that had started entering the building around 2:13 p.m. to build to a torrent.



**Exhibit 4A**

**Exhibit 4B**



**Exhibit 4C**[5]

***Injuries and Property Damage Caused by the January 6, 2021 Attack***

The D.C. Circuit has observed that "the violent breach of the Capitol on January 6 was a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). Members of this Court have similarly described it as "a singular and chilling event in U.S. history, raising legitimate concern about the security—not only of the Capitol building—but of our democracy itself." *United States v. Cua*, No. 21-cr-107, 2021 WL 918255, at *3 (D.D.C. Mar. 10, 2021); *see also United States v. Fox*, No. 21-cr-108 (D.D.C. June 30, 2021) (Doc. 41, Hrg. Tr. at 14) ("This is not rhetorical flourish. This reflects the concern of my colleagues and myself for what we view as an incredibly dangerous and disturbing attack on a free electoral system."); *United States v. Chrestman*, No. 21-mj-218, 2021 WL 765662, at *7 (D.D.C. Feb. 26, 2021) ("The actions of this violent mob, particularly those members who breached police lines and gained entry to the

---

[5]  Exhibits 4A-C show the breakthroughs in the defensive line on both the left and right flanks (4A) caused the entire police line to collapse and individual officers were swallowed by the crowd (4B) and many officers were assaulted as they waited in a group to retreat through doors and stairwells up onto the inaugural stage (4C).

Capitol, are reprehensible as offenses against morality, civic virtue, and the rule of law."); *United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 25 ("A mob isn't a mob without the numbers. The people who were committing those violent acts did so because they had the safety of numbers.") (statement of Judge Chutkan).

In addition, the rioters injured more than a hundred police officers. *See* Staff of Senate Committees on Homeland Security and Governmental Affairs and on Rules and Administration Report, Examining the Capitol Attack: A Review of the Security, Planning, and Response Failures on January 6 (June 7, 2021), at 29, *available at* https://www.hsgac.senate.gov/imo/media/doc/HSGAC&RulesFullReport_ExaminingU.S.Capitol Attack.pdf (describing officer injuries). Some of the rioters wore tactical gear and used dangerous weapons and chemical irritants during hours-long hand-to-hand combat with police officers.  *See id*. at 27-30.

Moreover, the rioters inflicted significant emotional injuries on police officers and others on scene that day who feared for their safety. *See id*; *see also* Architect of the Capitol, J. Brett Blanton, Statement before the House of Representatives Committee on House Administration (May 19, 2021), *available at* https://www.aoc.gov/sites/default/files/2021-05/AOC_Testimony_CHA_Hearing-2021-05-19.pdf (describing the stress suffered by Architect of the Capitol employees due to the January 6, 2021, attack).

Finally, the rioters stole, vandalized, and destroyed property inside and outside the U.S. Capitol Building.  They caused extensive, and in some instances, incalculable, losses. This included wrecked platforms, broken glass and doors, graffiti, damaged and stolen sound systems and photography equipment, broken furniture, damaged artwork, including statues and murals,

historic lanterns ripped from the ground, and paint tracked over historic stone balustrades and Capitol Building hallways.   *See id*; *see also* United States House of Representatives Curator Farar Elliott, Statement Before the House Appropriations Subcommittee on the Legislative Branch (Feb. 24, 2021), *available at* https://docs.house.gov/meetings/AP/AP24/20210224/111233/HHRG-117-AP24-Wstate-ElliottF-20210224.pdf (describing damage to marble and granite statues).   As set forth in the Statement of Offense, the attack resulted in substantial damage to the U.S. Capitol, to date requiring the expenditure of more than 2.7 million dollars in losses.

### B.     Defendant's Role in the January 6, 2021 Attack on the Capitol

On January 6, 2021, Hamner was in Washington D.C.   Once on restricted grounds of the U.S. Capitol, Hamner opportunistically attacked the police line, pulling away barricades and then assisted to ram a large billboard, a dangerous weapon when used as Hamner did, directly onto police officers protecting the entry point into the heart of our democracy.

### *Entrance onto Capitol Grounds*

Hamner, wearing a sweater proclaiming, "Guns Don't Kill People, Clintons Do" watched from the west lawn as rioters broke through the police line at the Peace Circle at approximately 12:52 p.m.   Upon seeing this, Hamner hopped over the barricades on the west lawn to the south of the Peace Circle and began tearing them down, allowing unfettered access to the Capitol grounds for thousands of rioters behind him.   Hamner pulled down the fence even as a near-by woman repeatedly plead, "Stop it! Stop it! This is wrong. This is going to get us in trouble. You guys are wrong," as depicted in Exhibit 5 (video submitted to the Court) and in Exhibit 5A below:



**Exhibit 5A**

***Hamner on the West Plaza***

Hamner was not deterred by the violence surrounding him; rather, he advanced to become part of it. At 1:22 p.m., he was captured on police body-worn camera on the front lines of the West Plaza.   In preparation for violence, Hamner switched out his baseball cap in Exhibit 5 for a black helmet with "S1" in white on the side, as depicted in Exhibit 6 below:



**Exhibit 6**

An open-source photo from January 6, 2021, depicts Hamner fighting with officers

from the U.S. Capitol Police and D.C. Metropolitan Police, who were assisting U.S. Capitol

Police at the time, over a police barricade on the West Plaza, as depicted in Exhibit 7 below:

14



**Exhibit 7**

At approximately 1:40 p.m., as officers continued to fend off repeated attempts by rioters to breach the police line and assault the officers, the rioters moved a large metal "TRUMP" billboard on wheels with a metal frame towards the barricade. As the billboard was moved closer to the police line, Hamner grabbed it and joined with others to thrust it onto the defensive line of police officers, using the billboard as a battering ram against the police officers who were attempting to hold the line, as depicted in Exhibits 8 and 9 (videos submitted to the Court) and Exhibits 8A through 8D (screen captures of Exhibit 8) below.   As the billboard was thrust upon them, the officers had to grab it and push it away from them to avoid serious injuries.



**Exhibit 8A**



**Exhibit 8B**



**Exhibit 8C**



**Exhibit 8D**

The assault of the officers with the billboard was a key part of the attack on heavily outnumbered police officers by hundreds of rioters on the West Front of the Capitol that resulted in many dozens of injured officers and property destruction in and around the Capitol. *See* Section II(A) ("Injuries and Property Damage Caused by the January 6, 2021 Attach") *supra.*   Further,

17

Hamner's violent conduct served to incite and embolden other violent rioters around him.

## III.    THE CHARGES AND THE PLEA

On November 9, 2021, Hamner was arrested in the District of Colorado on an arrest warrant issued from the United States District Court for the District of Columbia by Magistrate Judge Zia M. Faruqui in connection with a Criminal Complaint charging Hamner with Assaulting, Resisting, or Impeding Certain Officers as a Felony, in violation of 18 U.S.C. § 111(a) and (b), Obstruction of Law Enforcement During Civil Disorder, in violation of 18 U.S.C. § 231(a)(3), Knowingly Entering or Remaining in any Restricted Building or Grounds Without Lawful Authority, in violation of 18 U.S.C. § 1752(a)(1), and Engaging in Acts of Physical Violence in any Restricted Buildings or Grounds, in violation of 18 U.S.C. § 1752(a)(4).

Following a contested detention hearing in the District of Colorado on November 15, 2021, a magistrate judge ordered Hamner detained pending trial, citing both his risk of flight and the danger he poses to the community.

On November 19, 2021, a grand jury sitting in the District of Columbia returned a six count indictment against Hamner, charging him with Assaulting, Resisting, or Impeding Certain Officers as a Felony and Aiding and Abetting, in violation of 18 U.S.C. §§ 111(a) and (b) and 2, two counts of Civil Disorder and Aiding and Abetting, in violation of 18 U.S.C. §§ 231(a)(3) and 2, Entering or Remaining in any Restricted Building or Grounds With a Deadly or Dangerous Weapon, in violation of 18 U.S.C. § 1752(a)(1) and (b)(1)(A), Engaging in Acts of Physical Violence in any Restricted Buildings or Grounds with a Deadly or Dangerous Weapon, in violation of 18 U.S.C. § 1752(a)(4) and (b)(1)(A), and Act of Physical Violence in the Capitol Grounds or Buildings, in violation of 40 U.S.C. § 5104(e)(2)(F).

On May 17, 2022, Hamner pleaded guilty without an agreement to Count Two of the indictment, charging Civil Disorder and Aiding and Abetting. The remaining counts of the indictment are pending. Hamner has remained detained since his arrest.

## IV.     STATUTORY PENALTIES

Hamner now faces sentencing on Civil Disorder and Aiding and Abetting, in violation of 18 U.S.C. §§ 231(a)(3) and 2.

As noted by the U.S. Probation Office, Hamner faces up to 5 years of imprisonment, a fine up to $250,000, and a term of supervised release of not more than three years for Count Two, Civil Disorder and Aiding and Abetting.

## V.     THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark" for determining a defendant's sentence. *Id.* at 49. The United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions" and are the "starting point and the initial benchmark" for sentencing. *Id.* at 49.

The presentence investigation report ("PSIR") properly concluded that U.S.S.G. § 2A2.4 is the applicable Chapter Two guideline for Hamner's violation of 18 U.S.C. § 231(a)(3). *See* PSIR, ECF 26, ¶ 25. However, the PSIR incorrectly failed to apply the cross-reference from § 2A2.4(c) to U.S.S.G. § 2A2.2.

19

Section 2A2.4(c) instructs that § 2A2.2 be applied "[i]f the conduct constituted aggravated assault." In that phrase, "conduct" refers to all relevant conduct, not simply the conduct underlying the crime for which Hamner was convicted. *See United States v. Valdez-Torres*, 108 F.3d 385, 387–88 (D.C. Cir. 1997).   Section 2A2.2 defines "aggravated assault" as, *inter alia*, "a felonious assault that involved (A) a dangerous weapon with intent to cause bodily injury (i.e. not merely to frighten) with that weapon…or (D) an intent to commit another felony."   U.S.S.G. §2A2.2 cmt. n.1.

The cross-reference in §2A2.4(c) applies here because the conduct charged in the indictment constituted an aggravated assault. The Guidelines do not define "assault" or "felonious assault," and sentencing courts have looked to the common law to define "assault" for Guidelines purposes. *See United States v. Hampton*, 628 F.3d 654, 660 (4th Cir. 2010). Assault encompasses conduct intended to injure another or presenting a realistic threat of violence to another. *See United States v. Dat Quoc Do*, 994 F.3d 1096, 1099 (9th Cir. 2021) (federal common-law assault includes (1) "a willful attempt to inflict injury upon the person of another," or (2) "a threat to inflict injury upon the person of another which, when coupled with an apparent present ability, causes a reasonable apprehension of immediate bodily harm.") (citations omitted); *Lucas v. United States*, 443 F. Supp. 539, 543-44 (D.D.C. 1977) (individual assaulted police officer, in violation of 18 U.S.C. § 111, where he "forcibly grabbed" the officer; § 111 "includes the lifting of a menacing hand toward the officer, or shoving him"), *aff'd*, 590 F.2d 356 (D.C. Cir. 1979). Here, Hamner assaulted Capitol Police and Metropolitan Police Officers by violently pushing a large and heavy metal sign onto the line of police officers.   That conduct reflected both a threat that caused reasonable apprehensions of fear and a "willful attempt to inflict injury upon" the officers.

20

In addition to being an assault, the civil disorder offense to which Hamner pled guilty is a felony punishable by up to 5 years in prison.   *See* 18 U.S.C. § 231.   That means that he conducted a "felonious assault."   Notably, had Hamner been convicted under 18 U.S.C. § 111, his assault would qualify as a felony assault because, at a minimum, it involved physical contact when he and other rioters violently pushed the billboard into the line of police officers, making physical contact with them. *See* 18 U.S.C. § 111(a) (simple assault may be punished for up to one in prison, but where assaultive acts "involve physical contact with the victim of that assault or the intent to commit another felony, be fined under this title or imprisoned not more than 8 years"). The "felonious assault" here also qualifies as an "aggravated assault" as defined in U.S.S.G. § 2A2.2 cmt. n.1 for two reasons.   First, Hamner's felonious assault "involved . . . an intent to commit another felony." *Id.* Here, the interference with police during a civil disorder in violation of 18 U.S.C. § 231(a)(3) involved the intent to commit the felony violation of assaulting, resisting or impeding certain officers (18 U.S.C. § 111(a)(1) and (b)).   In other words, Hamner assaulted and interfered with police officers engaged in the performance of their official duties by helping to ram a large metal sign into them. The § 2A2.4(c) cross-reference applies regardless of whether Hamner was charged with or convicted of the other felony (Section 111 here) that Hamner intended to commit. *See United States v. Thompson*, 60 F.3d 514, 518 (8th Cir. 1995) (defendant committed aggravated assault where defendant was convicted under Section 111 and his conduct involved the intent to commit state law robbery, where the state law robbery charge was later dismissed); *United States v. Rue*, 988 F.2d 94, 97(10th Cir. 1993) (defendant committed aggravated assault where defendant was convicted under Section 111 and his conduct involved the intent to commit possession of a syringe and a controlled substance, where the defendant was charged with but not

21

convicted of the latter offenses); *United States v. Robles*, 557 F. App'x 355, 359 (5th Cir. 2014) (defendant committed aggravated assault where he was convicted under Section 111 and his conduct involved the intent to commit the uncharged state-law felony of evading arrest while using a vehicle); *United States v. Ranaldson*, 386 F. App'x 419, 429 (4th Cir. 2010) (defendant committed aggravated assault where he was convicted under Section 111 and his conduct involved the intent to commit the uncharged state law felony of intentionally attempting to disarm a law enforcement officer).   This Court has applied the cross-reference in §2A2.4(c) in similar circumstances. *See United States v. Leffingwell*, 21-cr-5 (ABJ), ECF No. 53 at 12-24.[6]

Second, Hamner's "felonious assault" was an "aggravated assault" under U.S.S.G. § 2A2.2 cmt. n.1(A) because the large sign constituted a dangerous weapon used with the intent to cause bodily injury. See U.S.S.G. § 1B1.1 cmt. n.1(E) (defining dangerous weapon). One of the officers who was a victim of Hamner's assault described the sign to the FBI as "10 to 15 feet wide and two or more feet high. The entire frame of the sign was metal. The wheels on the sign were also large and similar to wheels on a wheelbarrow. Officer (redacted) described the wheels as about the size of a human head. The metal frame of the sign was welded and screwed together."   *See* Exhibit 9: 302 of interview with USCP Officer N.S.   Indeed, this Court found the sign was "attached to a large wheeled foundation" and described the sign as "large [and] heavy" in this very case.   *See United States v. Hamner*, 21-cr-689 (ABJ), ECF No. 25 at 3 and 9.   This Court further noted the officers "easily could have been injured given the size, weight, and momentum of the sign."   *Id.*

---

[6] Courts in this district have applied the § 2A2.4(c) cross-reference in the following cases where application of the cross-reference was not disputed.   *United States v. Duke Wilson*, 21-cr-345 (RCL); *United States v. Devlyn Thompson*, 21-cr-461 (RCL); *United States v. Robert Palmer*, 21-cr-328 (TSC); *United States v. Languerand*, 21-cr-353 (JDB); *United States v. Fairlamb*, 21- cr-120 (RCL).

at 9-10.   Judge Lamberth found "the sign appeared to be at least ten feet by ten feet with casters the size of a grown man's head."   *See United States v. Neefe*, 21-cr-567 (RCL), ECF No. 56 at 4.

As is shown on multiple videos from different angles, Hamner helped use this billboard as a battering ram against the police line.   One officer described avoiding serious injury from it by mere seconds.   *See* Exhibit 9.   As is clear on the videos, Hamner helped direct and push the sign into police.   The government does not currently have any evidence of injury to police directly attributable to the sign, however given that evidence, there can be little serious dispute that Hamner intended to injure police with the weaponized sign.

The government also objects to the criminal history scoring contained in the draft PSIR.[7] The government submits the proper criminal history scoring is eleven points, which still places Hamner in criminal history category V, as the PSIR recommends, but with an additional point.

The PSIR assessed three criminal history points for Hamner's 2010 conviction for inflicting corporal injury on a spouse, for which he was originally sentenced to 240 days jail and 36 months' probation.   PSIR, ECF 26, ¶ 45. Pursuant to U.S.S.G. § 4A1.1(b), two points should be assessed; not three.   Hamner subsequently violated probation and was a probation absconder with an active arrest warrant for over 10 years.   The warrant was only resolved after his arrest on the instant offense, which resulted in Hamner being sentenced to an additional month in jail, for a total sentence of 9 months jail, scoring the same two points.   *See* U.S.S.G. § 4A1.2(k).   Because

---

[7] Although the government objected to the scoring of Hamner's 2003 conviction for marijuana cultivation, possession of controlled substance paraphernalia and illegal possession of explosives, it withdraws that objection based on the reasoning of *United States v. McDonald*, 991 F.2d 866, 871 (D.C. Cir. 1993) applied to U.S.S.G. § 4A1.2 cmt. n.10, which indicates that a conviction counts for criminal history purposes even where it has been set aside.

Hamner was a probation absconder on January 6, 2021, he was under a criminal justice sentence on that date and accordingly, he receives another 2 points, pursuant to U.S.S.G. § 4A1.1(d).

Based on the facts and circumstances of the offense and Hamner's criminal history, the government submits the proper guideline calculation for Hamner's guilty plea is:

| | |
|---|---|
| **Base offense level: § 2A2.4(a):** | **+10[8]** |
| **Cross Reference Applies: § 2A2.4(c)** | **apply 2A2.2** |
| **Base offense level: § 2A2.2(a)** | **+14** |
| **Specific offense characteristics:** | |
| (1) The offense involved use of a dangerous weapon (+4), § 2A2.2(b)(2)(B) | **+4** |
| **Chapter 3 Adjustments:** | |
| (1) Official victim (+6), § 3A1.2(b) | **+6** |
| (2) Acceptance of Responsibility (-3), § 3E1.1 | **-3** |
| **Final offense level:** | **21** |
| **Criminal history category: (Chapter 4, Part A):** | **V** |
| **Sentencing Guidelines range from sentencing table:** | **70-87 months[9]** |

## VI. SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). Some of the factors this Court must consider include: the nature and circumstances of the offense, § 3553(a)(1); the history and

---

[8] If the Court applies U.S.S.G. § 2A2.4 as the draft PSIR recommends, the physical contact enhancement would be correctly applied.  *See* PSIR ¶ 27.

[9] Pursuant to U.S.S.G. § 5G1.1(a), as a function of the 60-month statutory maximum sentence for the offense to which the defendant has pled guilty, the guideline imprisonment range would be 60 months.

characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct, § 3553(a)(6).   In this case, as described below, all of the Section 3553(a) factors weigh in favor of the recommended sentence.

### A.      Nature and Circumstances of the Offense

The attack on the U.S. Capitol, on January 6, 2021 is a criminal offense unparalleled in American history.   It represented a grave threat to our democratic norms; indeed, it was one of the only times in our history when the building was literally occupied by hostile participants. By its very nature, the attack defies comparison to other events.

While each defendant should be sentenced based on his or her individual conduct, each individual person who entered the Capitol and assaulted police on January 6 did so under the most extreme of circumstances, to which their conduct directly contributed.   As a person entered the Capitol, they would—at a minimum—have crossed through numerous barriers and barricades, heard the throes of a mob, and smelled chemical irritants in the air. Depending on the timing and location of their approach, in addition to their own acts of violence, they likely would have observed other extensive fighting with police.

While looking at Hamner's individual conduct, we must assess such conduct on a spectrum. This Court, in determining a fair and just sentence on this spectrum, should look to a number of critical factors, to include: (1) whether, when, how the defendant entered the Capitol building; (2) whether the defendant encouraged violence; (3) whether the defendant encouraged any acts of

property destruction; (4) the defendant's reaction to acts of violence or destruction; (5) whether during or after the riot, the defendant destroyed evidence; (6) the length of the defendant's time inside of the building, and exactly where the defendant traveled; (7) the defendant's statements in person or on social media; (8) whether the defendant cooperated with, or ignored, law enforcement; and (9) whether the defendant otherwise exhibited evidence of remorse or contrition.   While these factors are not exhaustive nor dispositive, they help to place each individual defendant on a spectrum as to their fair and just punishment.

The nature and circumstances of Hamner's crimes weigh heavily towards a significant term of incarceration as Hamner engaged in destructive and violent behavior throughout his time on Capitol grounds.   Hamner was part of the initial wave of rioters to breach the exterior perimeter of the Capitol grounds whereupon he personally tore down fencing keeping people off the grounds. *See* Exhibits 5 and 5A.   Hamner pulled away police barriers keeping rioters away from the police line, stripping police of what protection the barriers offered.   He engaged in a tug-of-war with police officers over such a barrier at one point.   *See* Exhibit 7.   When Hamner first saw the large "Trump" billboard being moved north over the crowd on the West Plaza, he exclaimed, "Oh yeah!" *See* Exhibit 8.   He then grabbed the sign and patted a rioter between him and the police to warn that rioter of the sign's arrival.   As the sign stopped moving north, Hamner grabbed one of the wheels and pulled the sign east toward the police line.   *Id.*   From there, as seen on the body-worn camera footage, Hamner pushed the sign into the police while the police desperately try to push it back off them.   *Id.*   Hamner's actions were not passively crowd-surfing the billboard as defense has suggested.   Upon Hamner's contact with the billboard, it pivots from travelling parallel to the police line to being directed at and onto the police.   As one involved officer described, if he had

not turned around at the exact moment he did, he almost certainly would have been hit in the head by a wheel from the billboard and the frame could have "split someone's head open."   That same officer stated that police initially attempted to push the sign away from the police line, but quickly realized a more effective tactic to remove the sign form the rioters was to pull the sign away from them and into the area behind the police line.

Hamner's actions on January 6 show an absolute disregard for the rule of law coupled with a willingness to incite and engage in violence. His actions show a willingness to violate the law, to engage in acts of disorder and violence, and to harm others, including uniformed police.

The seriousness of this offense and his assault on multiple police officers demands a lengthy sentence of imprisonment.

### B.  Hamner's History and Characteristics

Hamner's conduct on January 6, 2021, which demonstrated violence and disrespect for law enforcement, was merely the most recent example of such behavior. He has a lengthy criminal history that features multiple assault convictions.

This conviction represents Hamner's fifth felony conviction, and eleventh total criminal conviction.   Hamner's criminal history shows both an alarming contempt for the rule of law and a significant proclivity to use violence.   He spent the better part of twenty years on probation and constantly reoffended by committing new crimes.

In addition to the crimes for assaulting the police here, Hamner has been previously convicted of felony force/assault with a deadly weapon (not a firearm) with great bodily injury likely in California in 2005 for which he received one year in jail and three years on probation, which he subsequently violated and was sentenced to two years in prison.   *See* PSIR, ECF 26, ¶

43. Hamner assaulted his then-wife by placing a pillow over her face until she nearly passed out and broke her phone in half when she attempted to call 911.   The police subsequently found the broken cell phone in Hamner's vehicle.

Hamner has also been convicted of felony inflicting corporal injury on a spouse in California in 2010 for which he received nine months in jail and three years on probation.   *See* PSIR, ECF 26, ¶ 45. In that case, he headbutted his wife in the face at a casino and when she reported it to a Tribal Police Officer minutes later, Hamner fled on foot and jumped a wall into the yard of a private residence to avoid arrest.

Hamner has twice been convicted of resisting arrest, including in 2014 when he ignored a police officer who attempted to pull him over for failing to use a turn signal.   *See* PSIR, ECF 26, ¶ 46. Rather than comply, Hamner walked to his house, forcing the police officer to tackle him to the ground and fight for control of his arms.   Hamner placed his hands behind his back only when the officer drew his Taser and advised Hamner he was going to tase him if he did not comply.   Hamner told the officer he was resisting because he was subject to an arrest warrant from California.

In fact, Hamner did have an open arrest warrant from San Bernardino County, California dating back to August 10, 2011 for violating probation by failing to appear for a probation review hearing.   It was an in-state warrant only and is not extraditable from other states. Clearly, Hamner was aware of this warrant.   Still, he took no steps to address the matter other than sending a letter in October 2020 which did nothing to resolve it.   Instead, he willfully ignored the violation for ten years.   When faced with the possibility of addressing the warrant through arrest in 2014, he forcibly resisted police.   On November 9, 2021, when told he was

being arrested on a warrant (for the instant offense) he replied to the officer, "you know it's a non-extraditable one?"

Hamner not only committed violent crimes; he boasted about them. When arrested by FBI agents in this case, he told them, "You're lucky I ain't runnin' and making you guys go through hell right now.   Just look at my rap sheet.   I'm a runner and I'm a fighter, but ain't that today because I know I've been doing right."   This statement was captured on a video recording of Hamner's arrest made by a bystander and on police body camera.

When Hamner's actions on January 6 are juxtaposed with his violent criminal history, apparent disdain for authority and the rule of law, and his history of noncompliance with probation, it is clear that a lengthy sentence of incarceration is appropriate.

### C.     The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds, and all that it involved, was an attack on the rule of law. "The violence and destruction of property at the U.S. Capitol on January 6 showed a blatant and appalling disregard for our institutions of government and the orderly administration of the democratic process."[10] As with the nature and circumstances of the offense, this factor supports a sentence of incarceration.   Hamner's criminal conduct of assaulting police officers is the epitome of disrespect for the law. When Hamner entered the Capitol grounds, it was abundantly clear to him that lawmakers, and the police officers who tried to protect them, were about to be under siege.   Police officers were overwhelmed, outnumbered, and in some cases, in

---

[10] Federal Bureau of Investigation Director Christopher Wray, Statement before the House Oversight and Reform Committee (June 15, 2021) (hereinafter "FBI Director Wray's Statement"), available                                                                                                        at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/Wray%20Testimony.pdf

serious danger. The rule of law was not only disrespected; it was under attack that day.   A lesser sentence would suggest to the public, in general, and other rioters, specifically, that attempts to obstruct official proceedings and assaults on police officers are not taken seriously.   In this way, a lesser sentence could encourage further abuses. *See Gall*, 552 U.S. at 54 (it is a "legitimate concern that a lenient sentence for a serious offense threatens to promote disrespect for the law").

**D.     The Need for the Sentence to Afford Adequate Deterrence**

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C. § 3553(a)(2)(B). The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[11] The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol. The violence at the Capitol on January 6 was cultivated to interfere, and did interfere, with one of the most important democratic processes we have: the transfer of power. As noted by Judge Moss during sentencing in *United States v. Paul Hodgkins*, 21-cr-188-RDM:

> [D]emocracy requires the cooperation of the governed. When a mob is prepared to attack the Capitol to prevent our elected officials from both parties from performing their constitutional and statutory duty, democracy is in trouble. The damage that [the defendant] and others caused that day goes way beyond the several-hour delay

---

[11] *See* 18 U.S.C. § 2331(5) (defining "'domestic terrorism'").

in the certification. It is a damage that will persist in this country for decades.

Tr. at 69-70. Indeed, the attack on the Capitol means "that it will be harder today than it was seven months ago for the United States and our diplomats to convince other nations to pursue democracy. It means that it will be harder for all of us to convince our children and our grandchildren that democracy stands as the immutable foundation of this nation." *Id.* at 70.

The gravity of these offenses demands deterrence. This was not a protest. *See id.* at 46 ("I don't think that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights."). And it is important to convey to future rioters and would-be mob participants—especially those who intend to improperly influence the democratic process—that their actions will have consequences. There is possibly no greater factor that this Court must consider.

### *Specific Deterrence*

The need for the sentence to deter Hamner from future, similar criminal conduct also weighs heavily in favor of a sentence in the government's submitted Guidelines range.   Hamner's conduct on January 6, 2021 was egregious but not surprising given his criminal history.  *See United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 29-30 ("[The defendant's] remorse didn't come when he left that Capitol.   It didn't come when he went home. It came when he realized he was in trouble.   It came when he realized that large numbers of Americans and people worldwide were horrified at what happened that day.   It came when he realized that he could go to jail for what he did.   And that is when he felt remorse, and that is when he took responsibility for his actions.") (statement of Judge Chutkan).

### E.     The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to 'base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise,'" and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108. Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101. As the Third Circuit has stressed:

> The Sentencing Guidelines are based on the United States Sentencing Commission's in-depth research into prior sentences, presentence investigations, probation and parole office statistics, and other data. U.S.S.G. §1A1.1, intro, comment 3. More importantly, the Guidelines reflect Congress's determination of potential punishments, as set forth in statutes, and Congress's on-going approval of Guidelines sentencing, through oversight of the Guidelines revision process. See 28 U.S.C. § 994(p) (providing for Congressional oversight of amendments to the Guidelines). Because the Guidelines reflect the collected wisdom of various institutions, they deserve careful consideration in each case. Because they have been produced at Congress's direction, they cannot be ignored.

*United States v. Goff*, 501 F.3d 250, 257 (3d Cir. 2005). "[W]here judge and Commission *both* determine that the Guidelines sentences is an appropriate sentence for the case at hand, that sentence likely reflects the § 3553(a) factors (including its 'not greater than necessary' requirement)," and that "significantly increases the likelihood that the sentence is a reasonable one." *Rita*, 551 U.S. at 347 (emphasis in original). In other words, "the Commission's

32

recommendation of a sentencing range will 'reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives.'" *Kimbrough*, 552 U.S. at 89.

Here, while the Court must balance all of the § 3553 factors to fashion a just and appropriate sentence, the Guidelines unquestionably provide the most helpful benchmark. As this Court knows, the government has charged a considerable number of persons with crimes based on the January 6 riot. This includes hundreds of felonies and misdemeanors that will be subjected to Guidelines analysis. In order to reflect Congress's will—the same Congress that served as a backdrop to this criminal incursion—the Guidelines will be a powerful driver of consistency and fairness moving forward.

### F.        Unwarranted Sentencing Disparities

Finally, as to 18 U.S.C. § 3553(a)(6)—the need to avoid unwarranted sentencing disparities—the crimes that Hamner committed on January 6, 2021 are unprecedented. Mechanical comparison to many Section 213 and 111(a)(1) cases in other non-January 6 contexts would be a disservice to the magnitude of what the riot entailed and signified, because these crimes defy comparison to other obstructive and assaultive conduct in other contexts.   January 6 police officer assault cases that have already proceeded to sentencing provide helpful reference points.[12]

As of the date of this sentencing memorandum, several felony Capitol Riot defendants have been sentenced:

*United States v. Howard Charles Richardson,* 21-cr-721-CKK.   Richardson brought a metal pole with him to the Capitol which he used to strike a police officer three times, stopping

---

[12]  Attached to this sentencing memorandum is a table providing additional information about the sentences imposed on other Capitol breach defendants.   That table also shows that the requested sentence here would not result in an unwarranted sentencing disparity.

only when the pole broke.   Moments later, he was part of the group with Hamner who rammed the billboard into the line of police officers.   Richardson's guidelines called for a sentence of between 37 and 46 months and the United States requested a 46-month sentence.   The Court imposed a 46-month sentence for a violation of Section 111(a). Richardson is 72 years old and had no prior criminal convictions.

*United States v. Fairlamb*, 21-cr-120-RCL.   Fairlamb armed himself with a police baton and incited violence outside of the Capitol.   He was one of the very first rioters inside of the Capitol, and he entered the Capitol brandishing a weapon. Fairlamb also assaulted a police officer. Fairlamb's guidelines called for a sentence of between 41 and 51 months.   The United States requested 44 months' imprisonment.   The Court imposed a 41-month sentence for violations of Sections 1512(c)(2) and 111(a).

*United States v. Languerand*, 21-cr-353-JDB.   Languerand threw multiple objects at the police officers guarding the Capitol in the Lower West Terrace tunnel, and afterwards bragged on social medial about his role in the riot.   There, the guidelines recommended a sentence of between 46 and 57 months.   The government recommended a sentence of 51 months' imprisonment.   The Court imposed a 44-month sentence for violations of Sections 111(a) and (b).

*United States v. Thompson*, 21-cr-461-RCL.   The Court sentenced Thompson to 46 months' incarceration for fighting police officers in the Lower West Terrace tunnel.   Specifically, Thomson threw objects at officers and hit one on the hand with a metal baton causing a bruise. There, the United States recommended 48 months, in part based on Thompson's turning himself in and then cooperating with the government by providing information at multiple debrief meetings, prior to accepting a plea offer.   The guidelines imprisonment range in that case was 46

to 57 months.

*United States v. Creek*, 21-cr-645-DLF.   The Court sentenced Creek to 27 months' incarceration after a guilty plea to a single count Section 111(a)(1), which was the government's recommendation.   Creek's conduct included shoving one police officer back several feet before striking that officer on the face shield portion of helmet and pushing a second police officer down then kicking him. The guidelines imprisonment range in that case was 24 to 30 months.

*United States v. Wilson*, 21-cr-345-RCL.   Wilson was also on the Lower West Terrace on January 6.   There, he punched police officers, attempted to take their shields, and threw objects at them.   In that case, the United States recommended a sentence of 46 months incarceration.[13]   The guidelines imprisonment range called for a sentence between 41 and 51 months.   For violations of Sections 1512(c)(2) and 111(a), the Court sentenced Wilson to 51 months' imprisonment.

*United States v. Palmer*, 21-cr-328-TSC.   Palmer deployed the contents of a fire extinguisher directly into the Lower West Terrace tunnel onto police officers then threw it at the officers seconds later.   Palmer also threw objects into the tunnel at officers.   The United States calculated a guidelines imprisonment range of between 63 and 78 months and recommended a sentence of 63 months.   For assaulting police officers with a dangerous or deadly weapon (the fire extinguisher), Palmer was sentenced to 63 months' imprisonment for violating Sections 111(a) and (b).[14]

To be sure, the defendants in those cases were convicted of assault and/or obstruction

---

[13] The government credited Wilson with being the third Capitol rioter to enter a guilty plea to a felony charge.

[14] Palmer did not receive a three-level reduction pursuant to U.S.S.G. §3E1.1, because of his post-plea conduct.   Had he received that reduction, Palmer's guideline range would have been 46-57 months' incarceration.

offenses, not violations of 18 U.S.C. § 231(a)(3). But under 18 U.S.C. § 3553(a)(6), the sentencing court has to consider "the need to avoid unwarranted sentence disparities among defendants with *similar records* who have been found guilty of *similar conduct*," not just defendants convicted of the same statutory offenses. Here, Hamner has an extensive criminal record and his criminal conduct of thrusting the billboard at the line of officers was violently assaultive, and not merely disruptive or impeding officers as in the mine-run Section 231(a)(3) cases.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095.

## VII.   RESTITUTION

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes."[15] *United States v. Papagno*, 639

---

[15] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified

F.3d 1093, 1096 (D.C. Cir. 2011).   Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990), identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2), and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b).

Those principles have straightforward application here. As permitted under 18 U.S.C. § § 3663(a)(3), Hamner should be ordered to pay $2,000 in restitution to the Architect of the Capitol, which reflects in part the role Hamner played in the riot on January 6.[16] The riot at the United States Capitol had caused "approximately $2,734,783.14" in damages, a figure based on loss estimates supplied by the Architect of the Capitol as of April 5, 2022.   It is noted that the PSIR determined Hamner does have the ability to pay restitution.   *See* ECF 26, ¶ 88.   Hamner's restitution payment should be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol.

## VIII.   CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a sentence of imprisonment of 60 months, which is a guideline sentence as calculated by the government, a period of supervised release, restitution of $2,000, and the mandatory $100 special assessment.

---

at 18 U.S.C. § 3663A), which "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, does not apply here. *See* 18 U.S.C. § 3663A(c)(1).

[16] Unlike under the Sentencing Guidelines for which (as noted above) the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY


/s/Douglas G. Collyer
DOUGLAS G. COLLYER
Assistant United States Attorney
District of Columbia Detailee
N.D.N.Y. Bar 519096
U.S. Attorney's Office
14 Durkee Street, Suite 340
Plattsburgh, NY 12901
(518) 314-7800
Douglas.Collyer@usdoj.gov

38